**Thomas E. JADWIN, individually, et al., Appellants,**

v.

**MINNEAPOLIS STAR AND TRIBUNE COMPANY and Joe Blade, Respondents.**

**No. C5-82-1519.**

Supreme Court of Minnesota.

May 3, 1985.

Allen D. Barnard Erica C. Street, Minneapolis, for appellant.

Patricia A. Hirl, Norton L. Armour, Minneapolis, for Minneapolis Star and Tribune Co.

Paul R. Hannah, Paula D. Osborn Michael J. Vanselow, St. Paul, for Northwest Publications, Inc. and WCCO-TV, Inc.

WAHL, Justice.

Thomas E. Jadwin (Jadwin) and two corporations which he organized, Tax Exempt Bond Fund for Minnesotans, Inc. (Bond Fund) and Minnesota Fund Management, Inc. (MFM), brought this libel suit against the Minneapolis Star and Tribune Company (Star) and Joe Blade (Blade), a reporter for the Star, alleging that they had been libelled in an article written by Blade and published on the front page of the business-financial section of the Star on Wednesday, March 5, 1980. The trial court granted defendants' motion for summary judgment against all three plaintiffs. We affirm in part, reverse in part, and remand.

Jadwin was the promoter, president and principal shareholder of MFM and the president and director of the Bond Fund. He worked from September 1977 to May 14, 1980 to develop the double tax-exempt[1] Minnesota no-load bond mutual fund for public offering. Jadwin spent significant time incorporating the Bond Fund and MFM with assistance of legal counsel, registering MFM as an investment adviser under federal and state securities law and registering the Bond Fund with federal and state regulators for sale in Minnesota. He also developed a prospectus and supplemental sales literature as allowed under federal and state laws and regulations. In a promotional effort to attract fund investors, Jadwin, as an officer and director of MFM, placed advertisements in newspapers throughout the state of Minnesota offering

---

1. The Bond Fund would obtain close to total exemption from both federal and Minnesota income taxation by investing primarily in tax-exempt municipal bonds issued by the State of Minnesota, its municipalities and public authorities.

the fund to the public as an investment. He mailed 13,000 copies of the Bond Fund's prospectus and supplemental sales literature to prospective investors. On behalf of MFM, he also issued a press release to 30 Minnesota newspapers and magazines, including respondent Star, to announce the creation of the Bond Fund.[2]

Respondent Blade was the only reporter who requested an interview with Jadwin about the Bond Fund. In preparation for his story, Blade conducted more than 15 interviews, including three separate interviews with a deputy commissioner of securities for Minnesota and two interviews, including a picture session, with Jadwin. Blade reviewed the Bond Fund's public registration file at the Minnesota Department of Commerce, Division of Securities. Blade also investigated the mailing address of the Bond Fund. He discovered that it was the office of Executive Secretary, Ltd., a secretarial and answering service business. The article was finished on March 3, 1980; the business news editor approved the article for publication on Wednesday, March 5, 1980.

The article appeared on the first and second pages of the business-financial section of the newspaper during the impoundment period of the Bond Fund.[3] It was headlined "New City Mutual Fund Stages One-Man Show" and described Jadwin's difficulties in registering the Bond Fund with the Minnesota Securities Division. It described Jadwin as the "single employee" and "sole employee" of the Bond Fund, claiming Jadwin was "soliciting investments in the fund from his apartment." The article also emphasized that Jadwin had twice been asked to withdraw his registration by the Minnesota Securities Division because he lacked mutual fund

management experience but that the fund registration was approved after Jadwin met requirements by "agreeing * * * to keep the fund's expenses within legal limits." The article projected initial fund expenses would "bump up against Minnesota's 2 percent limit," though, and reduce investor returns.

The article also disputed Jadwin's claim that the fund was unique by asserting that similar funds and similar investments existed. It further claimed Jadwin had written in a letter to the securities division that he had been "appointed by two presidents" to government positions, when actually he had worked in government but was never personally appointed by a president. The article was accompanied by a picture of Jadwin and a picture of the office door of the secretarial and answering service company which served as the Bond Fund's mailing address with a picture of the first page of the Bond Fund's prospectus superimposed upon the door.

Two days after the article appeared, Jadwin, through his attorney, demanded retraction of the entire article in a letter to the president of the Star. The letter alleged the article contained "fake * * * statements" and "intentional omissions" that would harm the business and social reputations of Jadwin and his two companies. Soon thereafter Jadwin sent a second letter describing in detail what Jadwin alleged was false and defamatory about the article. The Star responded with two letters, both stating that the newspaper did not believe a retraction was in order. Thereafter, appellants commenced this action in Hennepin County District Court alleging libel of all three appellants.

Following extensive discovery, the Star moved the district court for summary judg-

**2.** The four-page press release announced the organization of the new fund and described the tax advantages of and the no-load or "no sales charge" nature of the investment in the fund.

**3.** Minnesota securities law required initial capitalization of $1 million before the Bond Fund could operate. During the impoundment period, the investment adviser solicits investors solely through the written prospectus and sup-

plemental sales literature in an effort to obtain the necessary minimum capitalization. All investor subscriptions are held in escrow by the fund custodian until the minimum capitalization is raised. Since the Bond Fund never raised the minimum capitalization, the fund custodian returned subscriptions to prospective investors. 1983 Minn.Rules § 2875.3940.

ment against all three plaintiffs. The court granted the Star's motion in its entirety. The court analyzed the case in light of *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) and its progeny, which hold that if the plaintiff is a public official or public figure, an essential element of the plaintiff's claim is clear and convincing proof of actual malice, i.e., that the defendant acted with willful or reckless disregard for the truth or falsity of the matter published. *Id., Curtis Publishing Co. v. Butts*, 388 U.S. 130, 84 S.Ct. 1975, 18 L.Ed.2d 1094 (1967). When the plaintiff is found to be a private figure, though, the states may impose any fault standard short of strict liability. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). The court found that all three plaintiffs were private figures. Relying on *Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971) and *Standke v. B.E. Darby & Sons, Inc.*, 291 Minn. 468, 193 N.W.2d 139 (1971), *cert. dismissed*, 406 U.S. 902, 92 S.Ct. 1608, 31 L.Ed.2d 813 (1972), however, the court held that when the defamatory matter involves an issue of public concern, even a private plaintiff must prove actual malice. Reading the article in light of the depositions, affidavits, answers to interrogatories and admissions, the court concluded that the plaintiffs had provided no factual support for actual malice, and entered summary judgment.[4] This appeal followed.

### I.

The first issue we must determine, and a crucial one, is whether the trial court erred in finding Jadwin and his corporate entities private figures for the purposes of this libel suit. If the trial court erred, the actual malice standard applies. If any of the plaintiffs are private figures, we are free to determine whether actual malice or a lesser standard of fault applies. We, thus, confront difficult issues of constitutional law. A brief review of the development of the common law rules and consti-

tutional doctrines regarding libel law provides a context for our inquiry.

The law of libel originated to promote certain interests of the state by means antipathetic to values central to our First Amendment guarantees. Historically, libel was primarily a criminal offense, making punishable any writing tending to bring into disrepute the state, established religion, or any individual likely to be provoked into a breach of the peace because of the words. Truth was no defense to a criminal charge. *See Curtis Publishing Co. v. Butts*, 388 U.S. 130, 151, 87 S.Ct. 1975, 1989, 18 L.Ed.2d 1094 (1967). *See generally* Veeder, The History and Theory of the Law of Defamation, 3 Colum.L.Rev. 546 (1903) (part 1), 4 Col.L.Rev. 33 (1904) (part 2). Libel law has since changed substantially, as the "direct consequence of the friction between it * * * and the highly cherished right of free speech." *State v. Browne*, 86 N.J.Super. 217, 228, 206 A.2d 591, 597 (1965) (citations omitted). Civil remedies became preferred, and the interests protected by the tort shifted to personal, reputational concerns. While allegedly defamatory statements were presumed false, truth was a defense. *See Thompson v. Pioneer Press Co.*, 37 Minn. 285, 294, 33 N.W. 856, 861–62 (1887); *Palmer v. Smith*, 21 Minn. 419, 420–21 (1875). Most importantly, a balance was negotiated between protecting personal reputation and the competing social interest in unrestricted communication by a complex overlay of legal rules governing the elements of the prima facie case, defenses, and shifting burdens of persuasion.

By its common law, Minnesota imposed strict liability for libel, *see Wild v. Rarig*, 302 Minn. 419, 446, 234 N.W.2d 775, 792 (1975), following the English common law rule. *Hulton & Co. v. Jones*, [1909] 2 K.B. 44, *aff'd.* 1910 A.C. 20 *cited in* W. Prosser, Handbook of the Law of Torts § 113 at 772–74 (4th ed. 1971). The defendant was

---

**4.** The court also concluded that MFM, since it was not mentioned by name in the article, had failed to state a claim, and that the accuracy of many of the allegedly defamatory statements could not seriously be disputed.

liable, regardless of fault, for unprivileged publication of false and defamatory statements which injured the reputation of the plaintiff. *See Matthis v. Kennedy*, 243 Minn. 219, 222–23, 67 N.W.2d 413, 416 (1954); Note, *Minnesota Defamation Law and the Constitution: First Amendment Limitations on The Common Law Torts of Libel and Slander*, 3 Wm. Mitchell L.Rev. 81, 83 (1977). The only element of the claim not a matter of strict liability was publication. The law required an intentional publication for recovery. Prosser, § 113 at 772–76; *see also Rarig*, 302 Minn. at 446, 234 N.W.2d at 792.

This stringent rule of strict liability had been limited, however, by a series of privileges, absolute and qualified, shielding some defamation defendants from liability. A publication covered by an absolute privilege is not actionable even though clearly false and defamatory, and operates as a complete defense regardless of malice. *Matthis*, 243 Minn. at 222–23, 67 N.W.2d at 416–17. The absolute privilege applies only to protect the public service or administration of justice. *E.g., Id.* at 223, 67 N.W.2d at 418 (matters published about a judicial proceeding related to the subject matter of the proceeding); *see Peterson v. Steenerson*, 113 Minn. 87, 129 N.W. 147 (1910) (publications in the course of legislative proceedings).

Qualified privileges have attached in a broader range of circumstances where the interest in shielding the defendant is considered less compelling, but still sufficiently important to vindicate. Historically, a publication has been privileged when

" 'fairly made by a person in the discharge of some public or private duty, whether legal or moral, or in the conduct of his own affairs, in matters where his interest is concerned.' " Prosser, § 115 at 786, quoting *Toogood v. Spyring*, [1834] 1 C.M.R. 181, 149 Eng.Rep. 1044; *see* Restatement (Second) of Torts §§ 593–598A (1976) (conditional privileges). *E.g., Nixon v. Dispatch Printing Co.*, 101 Minn. 309, 112 N.W. 258 (1907) (reports of official proceedings or public meetings); *Clancy v. Daily News Corp.*, 202 Minn. 1, 8, 277 N.W. 264, 268 (1938) (reports of a campaign for public office). The burden of persuasion on whether the privilege applies has rested upon the party claiming the defense. *Froslee v. Lund's State Bank*, 131 Minn. 435, 155 N.W. 619 (1915). Once the defendant has established a prima facie qualified privilege, that privilege is lost if plaintiff proves defendant's common law malice.[5] *Friedell v. Blakely Printing Co.*, 163 Minn. 226, 203 N.W. 974 (1925).

## II.

The basic theory of common law libel remained essentially unchanged until the landmark case of *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964)[6]. In *New York Times*, the United States Supreme Court made clear that the reputational interests protected by state libel law must yield when in conflict with the central meaning of the First Amendment: "the right of free public discussion of the stewardship of public officials." *Id.* at 273–75, 84 S.Ct. at 722–23. The publication at issue in *New York*

---

5. Common law malice differs significantly from constitutional malice necessary to overcome the constitutional privilege established in *New York Times Co. v. Sullivan*, 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964). Although both types of malice focus on the defendant's state of mind, common law malice is established by proof of ill will or improper motive toward plaintiff. *See McKenzie v. M.J. Burns Int'l Detective Agency, Inc.*, 149 Minn. 311, 312, 183 N.W. 516, 517 (1921). Constitutional malice, by contrast, requires proof of defendant's knowledge of falsity or reckless disregard of the truth or falsity of what he published. *New York Times,* 376 U.S. at 279–80, 84 S.Ct. at 725–26.

6. As legal commentator Anthony Lewis has noted:

> Until that day, libel in the United States had been entirely a local matter, left to the law of each state; no award of damages for libel, however large the sum or outlandish the legal theory underlying it, had ever been held to violate any provision of the Federal Constitution.

Lewis, *Annals of the Law: The Sullivan Case,* The New Yorker Magazine 52 (Nov. 5, 1984).

*Times* was an advertisement taken out by twenty Southern supporters of the civil rights movement, sponsored by A. Philip Randolph, and published by the New York Times. The advertisement solicited contributions for "The Committee to Defend Martin Luther King and The Struggle for Freedom in the South," and described mistreatment by the Montgomery, Alabama police and community of Dr. King and Black students active in protesting civil rights deprivations. Some of the statements contained in the advertisement were admittedly not accurate. Sullivan, an elected commissioner and police supervisor in Montgomery, alleged that these inaccurate statements defamed him in his capacity as a public official. The Alabama jury awarded him $500,000, the full amount claimed, on instructions from the court that the statements were libelous per se and not privileged, that general damages could be presumed, and that punitive damages could be awarded on proof of common law malice. The Alabama Supreme Court affirmed.

The United States Supreme Court reversed, holding that a state court could not award damages to a public official for defamatory falsehoods relating to official conduct unless the official proves actual malice with convincing clarity.[7] Actual malice is shown only by proof of defendant's actual knowledge of falsity or reckless disregard of the truth or falsity of his publication. *New York Times*, 376 U.S. at 279–80, 285–86, 84 S.Ct. at 725–26, 728–29. The court described the privilege thus erected as "the privilege for the citizen-critic of the government," *id.* at 282, 84 S.Ct. at 727, necessary to " '[t]he maintenance of the opportunity for free political discussion to the end that government may be responsible to the will of the people.' " *Id.* at 269, 84 S.Ct. at 720 *quoting Stromberg v. California*, 283 U.S. 359, 369, 51 S.Ct. 532, 536, 75 L.Ed. 1117 (1931). Drawing heavily on

parallels to the law of seditious libel, the court concluded that the common law of libel, when it permitted the courts to restrain criticism of government and public officials, offended the First Amendment.[8]

These principles were subsequently elaborated to bring "public figures" who were not government officials within the *New York Times* rule. *Curtis Publishing Co. v. Butts*, 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967). A majority of the *Butts* court concurred in Chief Justice Warren's reasoning for expanding constitutional protection to actions involving public figures:

> [D]ifferentiation between "public figures" and "public officials" and adoption of separate standards of proof for each have no basis in law, logic, or First Amendment policy. Increasingly in this country, the distinctions between governmental and private sectors are blurred. Since the depression of the 1930's, and World War II there has been a rapid fusion of economic and political power, a merging of science, industry, and government, and a high degree of interaction between the intellectual, governmental, and business worlds * * * While these trends and events have occasioned a consolidation of governmental power, power has also become much more organized in what we have commonly considered to be the private sector. In many situations, policy determinations which traditionally were channeled through formal political institutions are now originated and implemented through a complex array of boards, committees, commissions, corporations and associations, some only loosely connected with the Government.

*Butts*, 388 U.S. at 163, 87 S.Ct. at 1996 (Warren, C.J., concurring). Since the freedom of the press to engage in uninhibited debate about such persons' involvement in public issues and events is as crucial as it is in the case of public officials, the *New*

---

7. Hereinafter, the term actual malice is used to refer to the "constitutional malice" standard developed in *New York Times*.

8. The supreme court noted that the infamous Sedition Act of 1798, which by its terms had expired in 1801, was inconsistent with the First Amendment. *New York Times*, 376 U.S. at 276, 84 S.Ct. at 723.

*York Times* rule was extended to them. *Id.*

The court thereafter engaged in a protracted debate over the reach of the *New York Times* rationale to libel actions brought by private figures. In *Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971), three members of the court, forming the plurality, held that the *New York Times* standard applied when the defamatory matter concerned a matter of public interest regardless of the plaintiff's status. Reasoning from the preeminent role of public discussion of political issues embedded in the First Amendment and reflected in *New York Times*, the plurality concluded that the plaintiff's status was irrelevant to ensuring such open debate.

While not disputing the plurality's analysis of *New York Times*, the three dissenting justices in *Rosenbloom* contended that the competing interest in securing protection for individual reputation was, in such a case, of comparable constitutional significance. *See Rosenbloom*, 403 U.S. at 62, 91 S.Ct. at 1829 (Harlan, J., dissenting), 78 (Marshall, J., dissenting, joined by Stewart, J.). The dissenters' view ultimately prevailed in *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974). In concluding that "the state interest in compensating injury to the reputation of private individuals requires that a different rule should obtain with respect to them," *id.* at 343, 94 S.Ct. at 3008, the *Gertz* plurality relied on Justice Stewart's reasoning in *Rosenblatt v. Baer*, 383 U.S. 75, 88, 86 S.Ct. 669, 677, 15 L.Ed.2d 597 (1966) (Stewart, J., concurring) which emphasized the special dimensions of the interests at stake in the protection of an individual's own good name:

"[This right] reflects no more than our basic concept of the essential dignity and worth of every human being—a concept at the root of any decent system of ordered liberty. The protection of private personality, like the protection of life itself, is left primarily to the individual States under the Ninth and Tenth Amendments. But this does not mean that the right is entitled to any less recognition by this Court as a basic of our constitutional system."

*Gertz*, 418 U.S. at 341, 94 S.Ct. at 3008, *quoting Rosenblatt*, 383 U.S. at 92, 86 S.Ct. at 679 (Stewart, Jr., concurring). Striking a new constitutional balance with respect to private individuals, the *Gertz* plurality held that the libel claims of private individuals could be governed by a fault standard developed under state law, provided that no state could constitutionally impose liability without fault. *Gertz*, 418 U.S. at 345–48, 94 S.Ct. at 3009–11. The court further restricted recovery of presumed or punitive damages to cases in which the private defamation plaintiff proves actual malice. *Id.* at 349, 94 S.Ct. at 3011.

### III.

■ The trial court in the case before us held that Jadwin and the two corporate plaintiffs were private individuals, who had "neither invited undue attention and comment nor assumed special prominence prior to the article's publication." Since the determination of the plaintiffs' status is a question of law this court is not bound to extend any special deference to the trial court's conclusion on this question. *See Rosenblatt*, 383 U.S. at 88, 86 S.Ct. at 677; Restatement (Second) of Torts § 580A comment c (1976). We thus conduct an independent review of the record in light of the relevant law to determine if the district court properly concluded that these plaintiffs are private individuals.

In *Gertz*, the Supreme Court delineated three categories of public figures:

Hypothetically, it may be possible for someone to become a public figure through no purposeful action of his own, but the instances of truly involuntary public figures must be exceedingly rare. For the most part those who attain this status have assumed roles of especial prominence in the affairs of society. Some occupy positions of such persuasive power and influence that they are deemed public figures for all pur-

poses. More commonly, those classified as public figures have thrust themselves to the forefront of particular public controversies in order to influence the resolution of the issues involved. In either event, they invite attention and comment. *Gertz*, 418 U.S. at 345, 94 S.Ct. at 3009. The first group includes the rare "involuntary" public figure. The next category essentially contained celebrities and prominent social figures who are deemed public figures for "all purposes." The final group consists of limited purpose public figures who attain their position by thrusting themselves into the vortex of a public controversy to influence its outcome.

There is no question that Jadwin is neither an "involuntary" public figure, nor "all purpose" public figure. He is either a "limited purpose" public figure with respect to his involvement in developing and offering his mutual fund investment to the public, or, as the trial court concluded, a private figure. The line between limited purpose public figure status and private individual status has proved difficult to draw. Since *Gertz*, the Supreme Court has examined and developed the distinction. *Gertz* itself, however, is the closest case on its facts, and provides the best starting point for this inquiry.[9]

*Gertz* arose from an article published in the "American Opinion," the organ of the John Birch Society, about an alleged Communist campaign to discredit the police. The 18-page article concerned the trial and conviction of a Chicago police officer for the murder of a 17 year old boy. The article was intended to persuade readers that the policeman had been the victim of a Communist "frame-up," part of a larger conspiracy to lay the groundwork for a national police force and, in turn, and as a consequence, a totalitarian state. Elmer Gertz, a Chicago lawyer, was named as one of the links in this conspiracy along with a community citizen's council, a Roman Catholic priest, and an underground newspaper. The district court found in fact that Gertz played only a very small role in the article's expose of the purported war on the police. He was named only for his role as counsel for the victim's family in the civil action against the policeman. In that role, though, Gertz was accused of being an architect of the frame-up, labeled a "Leninist" and "Communist fronter," with a police file that "took a big, Irish cop to lift." These statements, among others, were concededly false and defamatory. The nub of the case was whether Gertz was a private or public figure within the new rule announced in the case.

The Supreme Court held that Gertz was not within any category of public figure. Although he had once been a mayoral appointee to city housing committees, that involvement was deemed insufficient to make him a public official. Nor was he found to be an "all purpose" public figure, notwithstanding his considerable stature as a lawyer, author and lecturer, long involvement in civic affairs, radio and television appearances, and representation of noteworthy clients. Narrowing its focus, the court also concluded that for the purposes of that lawsuit, he was not a "limited purpose" public figure with respect to his involvement in the prosecution of the police officer. His role had been confined to personal representation of the victim's family, and did not rise to the level of voluntary injectment into a public controversy the court believed necessary to trigger the *New York Times* rule.

In three subsequent opinions, the Supreme Court further illuminated the reach of the *Gertz* public figure categories. In *Time, Inc. v. Firestone*, 424 U.S. 448, 96 S.Ct. 958, 47 L.Ed.2d 154 (1976), the court concluded that the Firestone divorce proceeding, the subject of a *Time* magazine

---

**9.** Prior to *Gertz*, the court had in two major cases upheld findings that the plaintiffs were public figures. These cases are not particularly instructive in a close case like Jadwin's. Both plaintiffs had achieved a general notoriety or prominence far outstripping Jadwin's; in nei-

ther case was the plaintiff's public figure status in any significant dispute. *Curtis Publishing Co. v. Butts,* 388 U.S. 130, 87 S.Ct. 1975, 18 L.Ed.2d 1094 (1967) (consolidated with *Associated Press v. Walker*).

article was not the type of "public controversy" delineated in *Gertz. Firestone*, 424 U.S. at 454, 96 S.Ct. at 965. Although marital difficulties of extremely wealthy individuals are of interest to some portion of the reading public, Mrs. Firestone had not thrust herself voluntarily into any public controversy. Furthermore, she was not a prominent person outside of Palm Beach society. *Id.* at 453–55, 96 S.Ct. at 964–65; *see also* Slade R. Metcalf, Rights and Liability of Publishers, Broadcasters and Reporters, § 1.41 at 1–96 (1983). After *Firestone* the term "public controversy" cannot be equated with "all controversies of interest to the public." *Firestone*, 424 U.S. at 454, 96 S.Ct. at 965.

The Court next decided *Hutchinson v. Proxmire*, 443 U.S. 111, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979) and *Wolston v. Reader's Digest Association, Inc.*, 443 U.S. 157, 99 S.Ct. 2701, 61 L.Ed.2d 450 (1979), reversing trial and appellate court findings of a public figure in both cases. *Hutchinson* involved a defamation action which arose from a "Golden Fleece of the Month Award" given by Senator Proxmire for wasteful government spending. The lower courts found Hutchinson, a professor and director of a research project, a public figure because he successfully applied for federal funds, reported to local newspapers of the grants and had access to "some newspapers" and the "wire services" in responding to the award. *Hutchinson*, 443 U.S. at 134, 99 S.Ct. at 2687. The Supreme Court found none of these reasons persuasive. His access to the media came after the alleged libel and was thus irrelevant. *Id.* Further, Hutchinson neither "thrust himself or his views into public controversy to influence others" nor "assumed any role of public prominence in the broad question of concern about expenditures." *Id.* Moreover, those charged with defamation cannot by their own conduct create their defense by giving the claimant public figure status. Any *Gertz* "public controversy," if there were one at all, had no prior independent existence but was created by the libelous publication. *Id.*

The Court in *Wolston* excluded another individual from the public figure category of defamation plaintiff. Reader's Digest had published a book falsely naming Wolston as having been indicted as a Soviet espionage agent in 1958. Wolston had been the subject of a grand jury investigation at that time, and had received some attention in the press for his refusal to comply with a subpoena to appear. The District Court and Court of Appeals determined that this willful failure to appear constituted sufficient public involvement with a public controversy to find Wolston a public figure. The Supreme Court reversed, holding it "more accurate to say that petitioner was dragged unwillingly into the controversy." *Wolston*, 443 U.S. at 166, 99 S.Ct. at 2707.

The plaintiffs in *Gertz, Firestone, Hutchinson* and *Wolston* had this in common: all were private individuals enmeshed in personal lives or work which had momentarily caught the attention of the press and public, largely as illustrative of some perceived social ill. All were shielded by the application of the rule in *Gertz* from negligent injury to their personal reputations where they had neither impliedly consented to such exposure by "thrusting themselves" in the public arena, *Hutchinson*, 443 U.S. at 135, 99 S.Ct. at 2688, nor sought to resolve a "public controversy" which existed prior to the media's creating one by defaming them. *Wolston*, 443 U.S. at 167–68, 99 S.Ct. at 2707. Each was found not to be a limited purpose public figure.

■ Respondents, in the case before us, do not contend that Jadwin or his companies are "all purpose" or "involuntary" public figures. In light of our analysis of the Supreme Court's cases and the parameters of the "limited purpose public figure," though the case is close, we affirm the trial court's finding that Jadwin is not a public figure. There are clear parallels between Hutchinson and Jadwin. The Supreme Court emphasized that Hutchinson's "activities and public profile are much like those of countless members of his profession.

His published writings reach a relatively small category of professionals concerned with [his field of work]." *Hutchinson*, 443 U.S. at 135, 99 S.Ct. at 2688. Similarly, Jadwin's accomplishments and activities are not unlike countless other finance professionals and do not raise him to the level of public figure for purposes of this libel action. While Jadwin did solicit media attention to his enterprise, that attempt was no less necessary and routine for such entrepreneurs than was Hutchinson's request for federal grant funding and did not thereby make him a public figure. While the viability and investment potential of the Bond Fund was certainly a matter of public concern within the Star's circulation range, to hold, in effect, that soliciting public investment automatically transforms any small businessman into a public figure would, in our view, expand the category beyond the limits contemplated by *Gertz*. Jadwin at no time met the rationale of access to rebut the alleged libelous publication that is a distinguishing feature between private individuals and public figures. Under the facts and circumstances of this case, we hold Jadwin to be a private individual.

The status of the two corporate plaintiffs presents a more difficult question. The proper application of the *Gertz* categories in cases involving corporate plaintiffs has never been addressed by the United States Supreme Court. It is clear, however, that in its decision in *Gertz* the court was deeply responsive to the need for protection of uniquely human interests not possessed by corporations. The *New York Times* rule was obliged to yield only to preserve " 'our basic concept of the essential dignity and worth of every human being.' " *See Gertz*, 418 U.S. at 341, 94 S.Ct. at 3008 *quoting Rosenblatt v. Baer*, 383 U.S. 75, 92, 86 S.Ct. 669, 679, 15 L.Ed.2d 597 (1966) (Stewart, J., concurring). We question whether

a corporate reputation has the personal qualities sought to be protected by the private figure designation in *Gertz*,[10] and whether, even if it does not, such reputation may be afforded protection from injury under some circumstances. One court has stated:

> [T]he "public figure" standards set out in *Gertz* are designed to ascertain whether a person, through his activities, has lost his claim to his private life. It makes no sense to apply those standards to a corporation, which, regardless of its activities, never has a private life to lose.

*Martin Marietta Corp. v. Evening Star Newspaper Co.*, 417 F.Supp. 947, 955 (D.D. C.1976). In fact, it was quite clear to the *Martin Marietta* court, from the *Gertz* court's opinion, "that the values considered important enough to merit accommodation with interests protected by the first amendment are associated solely with natural persons and that corporations, while legal persons for some purposes, possess none of the attributes the Court sought to protect." *Martin Marietta*, 417 F.Supp. at 955. Even so, the court in *Martin Marietta* concluded that the state has an interest in protecting corporate reputations from injury. The state can accommodate that interest with fundamental First Amendment interests in any libel action by a corporate plaintiff against a media defendant by applying the malice standard when the defendant establishes that the publication in issue concerns matters of legitimate public interest. *Martin Marietta*, 417 F.Supp. at 956; *see also Diversified Management v. Denver Post, Inc.*, 653 P.2d 1103 (Colo. 1982). Other jurisdictions have adopted a "particularized" approach, analyzing the commercial conduct giving rise to the defamation to determine whether the corporation had injected itself into a preexisting controversy so as to become a limited pur-

---

**10.** Corporations have historically been denied equality with individuals in the enjoyment of a right to privacy, and other "purely personal" constitutional guarantees. *California Bankers Assn. v. Shultz*, 416 U.S. 21, 65–67, 94 S.Ct. 1494, 1519–1520, 39 L.Ed.2d 812 (1974); *United States v. White*, 322 U.S. 694, 698–701, 64 S.Ct. 1248,

1251–1252, 88 L.Ed. 1542 (1944). While the reputational interests recognized in *Gertz* may not rise to the level of constitutional privacy, the distinctions drawn between corporations and individuals in these areas are highly relevant to this inquiry.

pose public figure within the meaning of *Gertz. See, e.g., Bruno & Stillman, Inc. v. Glove Newspaper Co.*, 633 F.2d 583 (1st Cir.1980); *Steaks Unlimited, Inc. v. Deaner*, 623 F.2d 264 (3d Cir.1980); *Bose Corp. v. Consumers Union of United States, Inc.*, 508 F.Supp. 1249 (D.Mass.1981), *rev'd on other grounds*, 692 F.2d 189 (1st Cir. 1982).

Courts have generally distinguished between the ordinary incidents of a corporation's manufacturing and selling products on the one hand, and a corporation's business activities which are particularly clothed with the public interest on the other. Thus, for example, a manufacturer of commercial fishing boats has been found not to be a public figure for the purposes of a defamatory statement concerning its product's quality, *Bruno & Stillman*, 633 F.2d at 583, nor is a company which advertises in the usual manner with respect to goods offered to the public. *Vegod Corp. v. American Broadcasting Companies, Inc.*, 25 Cal.3d 763, 160 Cal.Rptr. 97, 603 P.2d 14 (1979) *cert. denied*, 449 U.S. 886, 101 S.Ct. 242, 66 L.Ed.2d 113 (1980). However, companies engaged in highly regulated businesses reflecting a special magnitude of public dependence and involvement in the activity have been found to be public figures, *American Benefit Life Insurance Co. v. McIntyre*, 375 So.2d 239, 242 (Ala. 1979) (insurance company), as have corporations offering stock to the public, or subjected to investigation by a state or federal agency. *Reliance Insurance Co. v. Barron's*, 442 F.Supp. 1341 (S.D.N.Y.1977) (stock offering); *American Benefit Life Insurance*, 375 So.2d at 240 (investigation by state insurance department); *Trans World Accounts, Inc. v. Associated Press*, 425 F.Supp. 814 (N.D.Cal.1977) (proposed administrative complaint by the FTC against plaintiff).

These cases reflect the increasing importance attached by the United States Supreme Court to disclosure of and access to commercial information. First Amendment protection has been specifically extended to commercial speech on the ground that society has a strong interest in the free flow of commercial information:

> So long as we preserve a predominantly free enterprise economy, the allocation of our resources in large measure will be made through numerous private economic decisions. It is a matter of public interest that those decisions, in the aggregate, be intelligent and well informed. To this end, the free flow of commercial information is indispensable.

*Virginia State Board of Pharmacy v. Virginia Citizens Consumer Council, Inc.*, 425 U.S. 748, 765, 96 S.Ct. 1817, 1827, 48 L.Ed.2d 346 (1976). The commercial status of the plaintiff in *Rosenbloom* was identified by Justice Brennan in the plurality opinion as crucial to the broad protections given the media in that case:

> Self-governance in the United States presupposes far more than knowledge and debate about the strictly official activities of various levels of government. The commitment of the country to the institution of private property, protected by the Due Process and Just Compensation Clauses in the Constitution, places in private hands vast areas of economic and social power that vitally affect the nature and quality of life in the Nation. Our efforts to live and work together in a free society not completely dominated by governmental regulation necessarily encompass far more than politics in a narrow sense.

*Rosenbloom*, 403 U.S. at 41, 91 S.Ct. at 1818. The court's increasing emphasis on the need for disclosure of commercial information proceeds side by side with its emphasis on the protection of personal privacy from defamatory disclosure and intrusion.

■ We hold, therefore, that corporate plaintiffs in defamation actions must prove actual malice by media defendants when the defendants establish that the defamatory material concerns matters of legitimate public interest in the geographic area in which the defamatory material is published, either because of the nature of the business conducted or because the public has an especially strong interest in the

investigation or disclosure of the commercial information at issue.[11] Such a rule will encourage the media to probe the business world to the depth which is necessary to permit the kind of business reporting vital to an informed public.

■ Turning to the facts of this case, we hold that Bond Fund and MFM are limited purpose public figures, required to show actual malice by the Minneapolis Star and Tribune and its reporter. They are corporations whose business activities are particularly clothed with the public interest. The Bond Fund would obtain close to total exemption from both federal and state income taxation by investing primarily in tax exempt municipal bonds issued by the State of Minnesota, its municipalities and public authorities. MFM was registered as an investment advisor under federal and state securities law. The Bond Fund was registered with federal and state agencies to sell bonds in Minnesota. MFM was engaged in soliciting investors for the Bond Fund at the time the alleged defamatory article was published. Both corporations were actively seeking the attention of the media and the public in news columns, voluntarily subjecting themselves to and assuming the risk of public scrutiny. This is precisely the sort of activity the public most needs to have adequately investigated and reported and is the sort of economic information afforded heightened First Amendment protection. Moreover, the reputational interests of these corporations is de minimis compared to the reputational interests of Thomas Jadwin, who may choose or be forced to seek other employment in the financial community.

■ We affirm the trial court's grant of defendants' motion for summary judgment as to these corporate plaintiffs. Although the trial court erred in finding the corporate plaintiffs to be private individuals, it correctly determined that proof of actual malice was necessary to support their claims. A genuine issue of fact as to

actual malice exists only if the facts permit the conclusion that the defendants "in fact entertained serious doubts as to the truth of [the] publication." *St. Amant v. Thompson*, 390 U.S. 727, 731, 88 S.Ct. 1323, 1325, 20 L.Ed.2d 262 (1968). After carefully scrutinizing the record before it, the trial court concluded that no genuine factual issue of actual malice had been raised. We, too, have reviewed the entire record, which includes the depositions of Thomas Jadwin, Joe Blade and Jeffrey Wartchow, Deputy Assistant Commissioner of the Minnesota Securities Commission, numerous interrogatories, admissions, the reporter's notes, and affidavits, and agree that no genuine factual issue of actual malice was raised. Since a showing of actual malice is an essential element of the corporate plaintiffs' case, failure to raise a fact issue on that question entitles the defendants to judgment against those parties.

## IV.

This court, having decided that Jadwin is not a public figure under *Gertz*, is free to adopt its own standard of liability when a libel action is brought by private individuals. We are limited under the Federal Constitution only by the United States Supreme Court's prohibition against imposing a strict liability standard and against allowing presumed or punitive damages absent proof of actual malice. We are also mindful that the court in *Gertz* warned that its inquiry would have involved "considerations somewhat different * * * if a state purported to condition civil liability on a factual misstatement whose content did not warn a reasonably prudent editor or broadcaster of its defamatory potential." *Gertz*, 418 U.S. at 348, 94 S.Ct. at 3011. Jadwin contends that we should adopt a simple negligence standard to fully vindicate the rights of private persons against defamatory statements or publications. Respon-

---

**11.** Not all courts so hold. *See Bank of Oregon v. Independent News, Inc.,* 298 Or. 434, 693 P.2d 35 (1985).

dents and Amici Curiae [12] claim the actual malice standard should apply to defamation plaintiffs, regardless of their status.

A survey of decisions of other states reveals that courts have responded to the *Gertz* opinion by considering various standards of liability. Some courts have extended the *New York Times* actual malice standard to private defamation plaintiffs regarding matters of public interest relying on the *Rosenbloom* plurality.[13] The New York Court of Appeals has followed a "gross irresponsibility" standard.[14] *Cha-*

*padeau v. Utica Observer-Dispatch, Inc.,* 38 N.Y.2d 196, 341 N.E.2d 569, 379 N.Y. S.2d 61 (1975); *Gaeta v. New York News, Inc.,* 62 N.Y.2d 340, 465 N.E.2d 802, 477 N.Y.S.2d 82 (1984). A majority of the state courts have adopted a standard have held that a simple negligence standard should apply.[15] Amici and respondents urge us to adopt the actual malice standard of liability even when a private individual sues a media defendant or at least to retain the actual malice test when the subject matter of the publication involves a matter of public interest.[16] We discuss the actual malice

---

**12.** By order dated January 12, 1984, we granted a motion by WCCO–TV, Inc. and Northwest Publications, Inc. to file an amici curiae brief with this court.

**13.** *See e.g., Walker v. Colorado Springs Sun, Inc.,* 188 Colo. 86, 538 P.2d 450 (1975), *cert. denied,* 423 U.S. 1025, 96 S.Ct. 469, 46 L.Ed.2d 399 (1975); *AAFCO Heating and Air Conditioning Co. v. Northwest Publications, Inc.,* 162 Ind.App. 671, 321 N.E.2d 580 (1974), *cert. denied,* 424 U.S. 913, 96 S.Ct. 1112, 47 L.Ed.2d 318 (1976); *Peisner v. Detroit Free Press, Inc.,* 82 Mich.App. 153, 266 N.W.2d 693 (1978). Although adopting the actual malice standard for private individuals, all three of these cases have limited its application to subjects of public interest.

**14.** The New York Court of Appeals formulated the test as follows:

[W]here the content of the article is arguably within the sphere of legitimate public concern, which is reasonably related to matters warranting public exposition, the party defamed may recover; however, to warrant such recovery he must establish, by a preponderance of the evidence, that the publisher acted in a grossly irresponsible manner without due consideration for the standards of information gathering and dissemination ordinarily followed by responsible parties.
*Chapadeau v. Utica Observer-Dispatch, Inc.,* 38 N.Y.2d 196, 341 N.E.2d 569, 571, 379 N.Y.S.2d 61, 64.

**15.** *Dresbach v. Doubleday & Co., Inc.,* 518 F.Supp. 1285 (D.D.C.1981); *Peagler v. Phoenix Newspapers, Inc.,* 114 Ariz. 309, 560 P.2d 1216 (1977); *Dodrill v. Arkansas Democrat Co.,* 265 Ark. 628, 590 S.W.2d 840 (1979) *cert. denied* 444 U.S. 1076, 100 S.Ct. 1024, 62 L.Ed.2d 759 (1979); *Cahill v. Hawaiian Paradise Park Corp.,* 56 Haw. 522, 543 P.2d 1356 (1975); *Troman v. Wood,* 62 Ill.2d 184, 187, 340 N.E.2d 292 (1975); *Gobin v. Globe Publishing Co.,* 216 Kan. 223, 531 P.2d 76 (1975) (limited to reports of judicial proceedings); *McCall v. Courier-Journal & Louisville Times Co.,* 623 S.W.2d 882 (Ky.1981), *cert. de-*

*nied,* 456 U.S. 975, 102 S.Ct. 2239, 72 L.Ed.2d 849 (1982); *Jacron Sales Co., Inc. v. Sindorf,* 276 Md. 580, 350 A.2d 688 (1976); *Stone v. Essex County Newspapers, Inc.,* 367 Mass. 849, 330 N.E.2d 161 (1975); *McCusker v. Valley News,* 121 N.H. 258, 428 A.2d 493 *cert. denied* 454 U.S. 1017, 102 S.Ct. 552, 70 L.Ed.2d 415 (1981) (sua sponte); *Marchiondo v. Brown,* 98 N.M. 394, 649 P.2d 462 (1982); *Thomas H. Maloney & Sons, Inc. v. E.W. Scripps Co.,* 43 Ohio App.2d 105, 334 N.E.2d 494 (1974), *cert. denied* 423 U.S. 883, 96 S.Ct. 151, 46 L.Ed.2d 111 (1975); *Martin v. Griffin Television, Inc.,* 549 P.2d 85 (Okla. 1976); *Memphis Publishing Co. v. Nichols,* 569 S.W.2d 412 (Tenn.1978); *Foster v. Laredo Newspapers, Inc.,* 541 S.W.2d 809 (Tex.1976), *cert. denied* 429 U.S. 1123, 97 S.Ct. 1160, 51 L.Ed.2d 573 (1976); *Seegmiller v. KSL, Inc.,* 626 P.2d 968 (Utah 1981); *Taskett v. King Broadcasting Co.,* 86 Wash.2d 439, 546 P.2d 81 (1976); *Havalunch, Inc. v. Mazza,* 294 S.E.2d 70 (W.Va.1981); *Denny v. Mertz,* 106 Wis.2d 636, 318 N.W.2d 141 (1982); *Phillips v. Evening Star Newspaper Co.,* 424 A.2d 78 (D.C.1980), *cert. denied,* 451 U.S. 989, 101 S.Ct. 2327, 68 L.Ed.2d 848 (1981).

**16.** Amici and respondents claim that this court has long vindicated the right of a free press through a qualified privilege to comment on matters of public interest. They argue that this privilege applied at common law regardless of plaintiff's status and required proof of actual malice for a plaintiff to prevail.

This privilege at common law was never extended beyond comment on matters of public interest regarding public officials. *See, e.g., Marks v. Baker,* 28 Minn. 162, 9 N.W. 678 (1881) (plaintiff was a city treasurer and candidate for re-election accused in article by defendant newspaper of embezzling city funds); *Friedell v. Blakely Printing Co.,* 163 Minn. 226, 203 N.W. 974, 975 (1925) (plaintiff, a candidate for public office, was the subject of a story in defendant newspaper containing libelous statements questioning his patriotism). Moreover, as implied in a previous opinion of this court, this qualified media privilege was subsumed by the actual

and gross irresponsibility standards together, since application of the gross irresponsibility standard by the New York court has shown it to be virtually indistinguishable in effect from the actual malice test. *See Gaeta v. New York News, Inc.,* 62 N.Y.2d 340, 465 N.E.2d 802, 477 N.Y.S.2d 82 (1984).

Avoidance of media self-censorship is the essential rationale for extending those standards to private defamation plaintiffs. *AAFCO Heating & Air Conditioning Co. v. Northwest Publications, Inc.,* 162 Ind. App. 671, 321 N.E.2d 580 (1974) *cert. denied,* 424 U.S. 913, 96 S.Ct. 1112, 47 L.Ed.2d 318 (1976). Occasional factual error is almost inevitable in the reporting and publishing of news. It has been argued with force that the heightened standard of actual malice is crucial to the maintenance of "breathing space" for the media. *See AAFCO Heating,* 162 Ind.App. at 683, 321 N.E.2d at 586; *Post v. Oregonian Publishing Co.,* 268 Ore. 214, 519 P.2d 1258 (1974); *Gertz,* 418 U.S. at 361, 94 S.Ct. at 3017 (Brennan, J., dissenting). This court has long sought to protect and enhance free and open discussion of public issues. A former chief justice of this court foresees that:

> The effect * * * [of lower fault standards] on the media is * * * fewer resources * * * [for] their primary functions of gathering, editing, and disseminating the news * * * [making] the me-

dia less effective in their job of keeping the public informed.

Sheran & Isaacman, *Do We Want a Responsible Press?: A Call for the Creation of Self-Regulatory Mechanisms,* 8 Wm. Mitchell L.Rev. 1, 48–49 (1982).

Some empirical evidence now available bears out this prognosis. Media defendants in those states adopting the negligence standard seem to prevail on motions for summary judgment at a substantially lower rate than in states with higher fault standards, necessitating greater expenditures of resources for trials and appeals.[17] Although many jury verdicts for plaintiffs are reversed on appeal in those states, the outlay to defend these suits cannot be recovered; no case has been found which was reversed on the ground that the finding of negligence was erroneous.[18] The availability of libel insurance may lighten the burden on media defendants. Franklin, *Suing Media for Libel, A Litigation Study,* 1981 Amer.B.Found. Research J. 795, 800 n. 13, 831 n. 75. We are mindful, however, that for some small newspapers the cost of sufficient coverage for high damage awards may be prohibitive. The consolidation of the newspaper industry and the large size of some other media corporations may empower those entities in the face of libel suits, but does nothing to protect small newspapers against such burdens. The

malice standard adopted by the Supreme Court in *New York Times. Rose v. Koch,* 278 Minn. 235, 250 n. 23, 154 N.W.2d 409, 420 n. 23 (1967); *see also New York Times v. Sullivan,* 376 U.S. 254, 280 n. 20, 84 S.Ct. 710, 726 n. 20, 11 L.Ed.2d 686 (1964). We note that *Marks, Friedell* and *Rose* would be decided in the same way regardless of whether or not we adopt a negligence standard for private individuals since the plaintiff in each case was either a public official or a public figure.

**17.** One study concluded from data collected from the results of 54 libel actions against media defendants commenced between 1980 and 1982 that "there appears to be a direct and dramatic correlation between the availability of summary judgment and the applicable degree of fault." Libel Defense Resource Center Bulletin No. 6 at 41 (1983). Under the actual malice

standard, defendants prevailed 83% of the time, while under a negligence standard, the success rate was only 33%. *Id.* This data is consistent with the results of a study of libel actions decided between 1976 and 1980, which found plaintiffs generally more successful in reaching trial after *Gertz.* Franklin, *Winners and Losers and Why: A Study of Defamation Litigation,* 1980 Am.B.Found.Research J. 455.

**18.** The LDRC study, *see supra* n. 17, revealed that those cases tried on a negligence standard were reversed at a rate of 62.5%, somewhat below the overall 70% reversal rate. Lib.Def. Res.Cen.Bull. No. 6 at 43 (1983). All were reversed on grounds other than insufficient proof of fault, such as truth, privilege, absence of proof of damage, or that the matter was not defamatory. *Id.*

small, independent newspaper may become an endangered species.[19]

If the media's right and obligation to freely investigate and report the news were the only compelling interest at stake in libel actions brought by private individuals we would, without question, adopt the strict standards of fault set forth in *New York Times* and *Rosenbloom.* We must, however, carefully weigh in the balance, as did the *Gertz* court, the "strength of the legitimate state interest in compensating private individuals for wrongful injury to reputation." *Gertz*, 418 U.S. at 348, 94 S.Ct. at 3011. Throughout history, personal reputation has been cherished as important and highly worthy of protection.[20] As *Gertz* stressed, private individuals ordinarily have little or no media access to rebut alleged libelous charges and, unlike public officials or figures, have not assumed the risk of public media comment. *Id.* at 344–45, 94 S.Ct. at 3009. They are "not only more vulnerable to injury than public officials and public figures, they are also more deserving of recovery." *Id.; see also, Troman v. Wood,* 62 Ill.2d 184, 193, 340 N.E.2d 292, 296 (1975); *Taskett v. King Broadcasting Co.,* 86 Wash.2d 439, 445, 546 P.2d 81, 85 (1976). Given that such an individual's sole means to vindicate his or her reputation may be judicial determination that the injurious statement is in fact false, to foreclose that redress by adopting the actual malice standard seems to us to go too far in extinguishing the only protection a private individual may invoke. We further note that the line we draw today with respect to the determination of private figure status of corporations reduces to some extent our concern for the chilling effect that rejecting the actual malice test may occasion.

▀▀▀▀ After carefully considering the standards of liability, and the rules of the various states adopting the negligence standard in particular, we conclude that the following standard best reconciles the competing societal interests in the protection of private reputation and the media's right and obligation to freely investigate and report the news. We hold that a private individual may recover actual damages for a defamatory publication upon proof that the defendant knew or in the exercise of reasonable care should have known that the defamatory statement was false. The conduct of defamation defendants will be judged on whether the conduct was that of a reasonable person under similar circumstances. Restatement (Second) of Torts, § 580B comment g (1976). In resolving that issue, we accept the Restatement position that "[c]ustoms and practices within the profession are relevant in applying the negligence standard, which is, to a substantial degree, set by the profession itself,

---

**19.** Even when they do survive, the threat of libel suits may render small newspapers ineffective as guardians of the public weal by deterring investigation of controversial subjects or even official misconduct. The silencing of one small newspaper has been documented in detail. The Alton, Illinois, *Telegraph* had a history of championing the cause of the oppressed and bringing public wrongs to light before it was sued for libel over a decade ago. One of its early editors, an abolitionist, was killed by a pro-slavery mob in 1837; one of its stories led to the resignation of two state Supreme Court justices. In 1969, it received a tip that underworld money was going to a local builder. In the course of investigating the tip, reporters contacted the Justice Department, resulting ultimately in the builder losing his credit source. The builder sued for libel, and was awarded over 9 million dollars in damages from a jury. To raise the 10 million dollar appeal bond, the paper sought the aid of a federal bankruptcy court, but was not permitted to press its appeal. The parties finally settled for $1,400,000. Libel insurance covered 1 million; the paper borrowed the rest. When the editor was later informed of possible wrongdoing in the sheriff's department, the editor decided not to investigate, saying, "Let someone else stick their neck out this time." Lewis, *supra* n. 6, at 82.

**20.** In the words of Shakespeare:

Good name in man and woman, dear my Lord,
It is the immediate jewel of their souls.
Who steals my purse steals trash; 'tis something, nothing;
'Twas mine, 'tis his and has been slave to thousands;
But he that filches from me my good name
Robs me of that which not enriches him
And makes me poor indeed.

William Shakespeare, *Othello The Moor of Venice,* Act III, scene 3, line 155.

though custom is not controlling." *Id.* As required by *Gertz*, a private plaintiff may only recover compensation for actual injury supported by competent evidence when he or she proves only that the defendant acted negligently in publishing the defamatory matter. *Gertz*, 418 U.S. at 349–50, 94 S.Ct. at 3011–12. Plaintiff must prove actual malice on the part of the defendant to recover punitive damages. *Id.* at 348–50, 94 S.Ct. at 3011–12. We do not find on the record before the trial court evidence to raise a genuine issue of material fact as to actual malice.[21] We do not intend by our adoption of a negligence standard for a private individual defamation plaintiff to preclude the use by defendants of any absolute or qualified privilege recognized in this state, the application of which may be warranted by the facts. The meaning of any unprivileged statement or communication, however, is to be construed together with its context. Restatement (Second) of Torts, § 563 comment d (1976).

Because the trial court applied the actual malice standard instead of a negligence standard in granting summary judgment against Jadwin, we reverse that portion of the trial court's judgment and remand the case for further proceedings.

Affirmed in part, reversed in part and remanded.

KELLEY, Justice (concurring in part and dissenting in part).

The majority today sustains the trial court's finding that Jadwin is not a public figure. The court further adopts the negligence standard as applying to a libel claim by a private individual. With these conclusions, I concur. The majority, however, overrules the trial court's finding that the corporations owned solely by Thomas Jadwin, Tax Exempt Bond Fund for Minnesota, Inc. (Bond Fund) and Minnesota

Fund Management, Inc. (MFM), are private figures, and yet it adopts the trial court's ruling that the constitutional actual malice test is to be applied to their claims. It is from these latter conclusions that I respectfully dissent.

The majority begins its discussion of these issues by stating that Thomas Jadwin is the promoter and principal shareholder of MFM and the president and director of the Bond Fund. This reference is somewhat misleading. He *is* the *sole* shareholder, president, and secretary-treasurer of MFM. MFM is Jadwin solely doing business in corporate form. Until its shares have been sold—an event which did not occur in this case allegedly because of the publication of the alleged defamatory article—Jadwin is the Bond Fund doing business in corporate form. He also is the president, director, and sole incorporator of the Bond Fund, which was organized with the sole objective of *selling* its shares. Referring to Jadwin as the "principal figure", as does the majority, in my view is misleading; he is MFM and the Bond Fund.

To accomplish his objective of selling no-load, open-end tax exempt mutual fund shares, Jadwin was required to comply with a number of federal and state security statutes. He spent approximately three years in this endeavor. In doing so, he retained and was advised by legal counsel generally acknowledged as being exceptionally proficient in security law requirements. He likewise retained and was advised by a nationally known accounting firm, which had considerable experience in the area of securities' issues.

Federal law required that Jadwin register: (1) the mutual fund under the Investment Company Act of 1940 (15 U.S.C. § 80A–1 to 80A–52 (1982)); (2) the investment advisor under the Investment Advisor

---

**21.** A jury finding of actual malice is subject to de novo review on appeal. Since actual malice is a constitutional fact, the appellate court must conduct an independent review of the record to determine if the evidence establishes actual malice with convincing clarity. *Bose Corp. v. Consumers Union of the United States, Inc.,* —— U.S.

——, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984). Similarly, since a finding of negligence is also a matter of constitutional fact, we will conduct a de novo review of such finding on appeal. Restatement (Second) of Torts § 580B comment k (1976).

Act (15 U.S.C. § 80b–1 to 80b–21 (1982)); (3) the transfer agent pursuant to section 17(a) of the Securities Exchange Act of 1934 (15 U.S.C. § 78q–1(c) (1982)); (4) and the securities to be offered for sale with the Securities Exchange Commission (SEC) under the Securities Act of 1933 (15 U.S.C. § 77a (1982) *et seq.*). Federal law also sets stringent rules regulating the distribution of sales literature in the form of both content and timing restrictions. *See, e.g.,* 15 U.S.C. § 77e (1982); 15 U.S.C. § 77j (1982). In addition, Jadwin was required to comply with applicable provisions of Minnesota's Blue Sky Laws. *See, e.g.,* Minn.Stat. § 80A.01 (1984) *et seq.* (governing, *inter alia,* the registration and sale of securities); Minn.Stat. § 80A.04 (1984) and 1983 Minn.Rules 2875.2300–2875.2510 (concerning investment advisor records and licensure); and 1983 Minn.Rules 2875.3900–2875.3980 (governing investment companies). Numerous commentators, scholars and even this court have recognized that the basic purpose, if not the preeminent purpose, of the federal and state requirements is the dissemination of adequate and accurate information concerning mutual funds, the fund's advisor, and the fund's securities. *See* L. Loss, Fundamentals of Securities Regulation, 29–38 (1983); Bloomenthal, Securities Law Handbook, § 2.01–.02 (1984); *McMenomy v. Ryden,* 276 Minn. 55, 148 N.W.2d 804 (1967); *Logan v. Panuska,* 293 N.W.2d 359 (Minn. 1980). Since neither federal nor state security authorities have authority to disprove of securities, the sole purpose of these registration requirements is to ensure an adequate and accurate disclosure of material facts concerning the company and the securities it proposes to sell to the end that prospective investors may make an informed appraisal of the merits of the securities. *See* L. Loss, Fundamentals of Securities Regulations, *supra.* Jadwin, as the sole owner of MFM and as the sole incorporator of Bond Fund, complied with these statutes and the rules and regulations promulgated thereunder. SEC officials as well as state officials approved his registration statements, prospectus materials and supplementary sales literature.[1] Legislative bodies, both federal and state, have considered and determined what measures are necessary for the protection of investors. State and federal departments have augmented the statutes with extremely specific, comprehensive and extensive rules, regulations and liability provisions. To me it seems superfluous and unwarranted to add to this armament of federal and state regulation the weapon that a state regulated corporate entity, such as Bond Fund and MFM, must prove constitutional actual malice before recovering defamation compensatory damages. *Bruno & Stillman, Inc. v. Globe Newspaper Co.,* 633 F.2d 583 (1st Cir.1980).

In addition, a majority of both federal and state courts have rejected the contention that corporations are always public figures. Today the majority of this court holds these two corporations must meet the higher liability threshold of proving constitutional actual malice in this defamation action. In doing so, it "question(s) whether a corporate reputation has personal qualities sought to be protected by the private figure designation in *Gertz.*" The majority seemingly places great reliance on *Martin Marietta Corp. v. Evening Star Newspaper Co.,* 417 F.Supp. 947 (D.D.C.1976).

---

1. The trial court concluded that since MFM was not named in the news article, it had failed to state a claim. I would hold this was error. Any prudent investor would likely attribute to MFM any allegations of problems associated with Bond Fund because the investment advisor is so closely associated with the fund, and indeed manages it. Bond Fund is MFM's only "client." A number of cases hold a person need not be named in the publication, if the context of the publication, in essence, identifies the person. *See e.g. Avins v. White,* 627 F.2d 637, 643 (3rd Cir.), *cert. denied,* 449 U.S. 982, 101 S.Ct. 398, 66 L.Ed.2d 244 (1980) (It is not necessary for an alleged defamatory statement to refer specifically to plaintiff before it is actionable); *Zerpol Corp. v. DMP Corp.,* 561 F.Supp. 404, 410 (E.D. Pa.1983) (test is whether defamatory communications may reasonably be understood as referring to plaintiff); *Miller v. Lear Siegler, Inc.,* 525 F.Supp. 46, 55 (D.Kan.1981) (one claiming libel need not be named in article and court may look to extrinsic evidence to determine if article has application to particular party).

The majority of federal courts, however, have rejected the per se rule of *Martin Marietta,* and have in a number of cases held that a corporation may be a private figure. The reason for the general rejection of the *Martin Marietta* analysis is, perhaps, best stated in *Trans World Accounts, Inc. v. Associated Press* where the court said:

[I]t is also true that the line between the interests of natural persons and corporations is frequently fuzzy and ill defined. Various legal considerations have long led to the incorporation of businesses that are in economic reality but individual proprietorships or partnerships. On the other hand, very large business enterprises may be conducted as individual proprietorships or partnerships. For that additional reason it seems that for the purpose of applying the First Amendment to defamation claims, the distinction between corporations and individuals is one without a difference.

425 F.Supp. 814, 819 (N.D.Cal.1977).[2] Similarly, the Fourth Circuit Court of Appeals in *Arctic Co., Ltd. v. Loudoun Times Mirror,* 624 F.2d 518 (4th Cir.1980), *cert. denied,* 449 U.S. 1102, 101 S.Ct. 897, 66 L.Ed.2d 827 (1981), held a corporation was not a public figure under the facts in that case so as to trigger the constitutional actual malice test. The First Circuit in *Bruno & Stillman, Inc. v. Globe Newspaper Co.,* 633 F.2d 583 (1st Cir.1980), in rejecting the *Marietta* analysis said, "The only case that supports the district court's approach [the *Marietta* approach] rests upon an assumption that a corporation's interest in protecting its reputation is less important than that of an individual person." *Id.* at 590. *See also, Reliance Insurance Co. v. Barron's* 442 F.Supp. 1341, 1347 (S.D.N.Y. 1977).

The United States Supreme Court has not yet decided whether corporations are always public figures. In *Bose Corp. v. Consumers Union of the United States, Inc.,* 508 F.Supp. 1249, 1274 (D.Mass.1981), *rev'd on other grounds,* 692 F.2d 189 (1st Cir.1982) *aff'd,* —— U.S. ——, 104 S.Ct. 1949, 80 L.Ed.2d 502 (1984), the trial court held that Bose Corporation was a public figure. On appeal to the First Circuit Court of Appeals, Bose conceded the public figure characterization. Judge Campbell, however, in a concurrence stated: "I wish to emphasize my understanding that this court is in no way passing upon the actual merits of the district court's finding that Bose Corporation was a public figure." 692 F.2d at 197. The Supreme Court of the United States noted Judge Campbell's special concurrence stating, "We, of course, also do not pass on that question." —— U.S. at —— n. 8, 104 S.Ct. at 1955 n. 8. It is clear from both of these statements that both the Court of Appeals and the United States Supreme Court doubted the propriety of Bose Corporation's concession that it was a public figure. This suggests to me that both courts would have found Bose Corporation to be a private figure.

State courts which have addressed the issue appear to be in accord with the majority of the federal courts. As noted in *Bruno & Stillman, Inc. v. Globe Newspaper Co., supra,* under the law of New Hampshire, corporations are not per se public figures. 633 F.2d 583, 590. In California, a corporation's right to redress against defamation is well-established. *Vegod Corp. v. American Broadcasting Companies, Inc.,* 25 Cal.3d 763, 160 Cal.Rptr. 97, 603 P.2d 14 (1979), *cert. denied,* 449 U.S. 886, 101 S.Ct. 242, 66 L.Ed.2d 113 (1980); *DiGiorgio Fruit Corp. v. American Federation of Labor,* 215 Cal.App.2d 560, 30 Cal. Rptr. 350 (1963); *Daniels v. Sanitarium Association, Inc.,* 59 Cal.2d 602, 609, 30 Cal.Rptr. 828, 833, 381 P.2d 652, 657 (1963). New York allows corporations to sue for defamation without encountering the defense of constitutional actual malice. *Greenleigh Associates, Inc. v. New York Post Corp.,* 106 App.Div.2d 357, 484 N.Y. S.2d 1011 (1984); *Chapadeau v. Utica Ob-*

---

**2.** The court went on to hold that although the plaintiff was not a public figure, it became one after the F.C.C. had filed a complaint against it alleging illegal collection practices, 425 F.Supp. at 820–821. In this case at bar, of course, there has been no such governmental action.

*server-Dispatch, Inc.*, 38 N.Y.2d 196, 379 N.Y.S.2d 61, 341 N.E.2d 569 (1975). The Oregon Court of Appeals has held an incorporated bank was not a public figure. *Bank of Oregon et al. v. Independent News, Inc. et al.*, 65 Or.App. 29, 670 P.2d 616 (1983). Its decision was affirmed by the Oregon Supreme Court, 298 Or. 434, 693 P.2d 35 (1985). *See also, Tribune Co. v. Levin*, 426 So.2d 45 (Fla.App.1982). An analysis of these and other cases clearly demonstrates that a majority of the courts have rejected the *Marietta* analysis that corporations are always public figures for the purpose of a defamation suit.

However, I do not understand the majority to contend otherwise. Instead, the majority would, in effect, hold that a plaintiff corporation is a public figure if the defendant can "establish that the defamatory material concerns matters of legitimate public interest in the geographic area in which the defamatory material is published, either because of the nature of the business conducted or because the public has an especially strong interest in the investigation or disclosure of the commercial information at issue." It is with that holding that I disagree. If either the Bond Fund or MFM was a large publicly held corporation with access to financial resources in the millions of dollars, I might well concur that either or both corporations. was a limited purpose public figure. *See generally Reliance Insurance Co. v. Barron's*, 442 F.Supp. 1341 (S.D.N.Y.1977).[3] Neither the Bond Fund or MFM enjoy that status. In effect, each is the alter ego of Jadwin. It seems to me highly inconsistent to hold that Jadwin is a private individual for purposes of maintaining a libel suit when the two corporations, whose only acts were those of Jadwin alone, are to be held to be limited purpose public figures and, therefore, subject to the

burden of the constitutional actual malice test.[4] Jadwin's actions in forming the Bond Fund are the corporations' actions; and the corporations' actions are the actions of Jadwin. Thus, I fail to perceive why there should be a different standard of proof applied to the libel claims of either. Although it may well be true that in certain circumstances a corporate reputation has no personal qualities, it certainly is not true ·of a one-man corporation and I submit it is not true in this case.

I suggest that a corporation engaged in the business of franchising would be a public figure under the test today announced by this court. However, in *Golden Bear Distributing Systems of Texas, Inc. v. Chase Revel, Inc.*, 708 F.2d 944 (5th Cir.1983) the court rejected the claim. There the publisher of the alleged libel contended that a corporation is a public figure by reason of its business advertising—a fact on which the majority seemingly relies heavily in this case. The Fifth Circuit held that notwithstanding advertising, the injured corporation did not "thrust itself" into a public controversy by merely advertising its services. The court there pointed out that were it to hold to the contrary, the mere fact of advertising would render all corporate business public figures in defamation suits. So too, I would presume, the publication of material concerning corporate banking policies is a matter of legitimate public interest. Certainly it cannot be said the public does not have a strong interest in the investigation and disclosure of information concerning the bank's practices, and certainly the corporate banking business is one of the most highly regulated in our American Society. Nevertheless, the Oregon Court of Appeals in *Bank of Oregon et al. v. Independent*

---

**3.** This case involved a corporation with billions in assets, a large number of shareholders, and a $50 million national stock offering.

**4.** At the time of the allegedly libelous publication MFM was a one person corporation as was Bond Fund. Jadwin can probably prove his personal financial loss causally related to the business failure. This creates an anomaly. The corporations can't recover their actual losses

because of the almost impossible burden of proving constitutional actual malice, whereas Jadwin, if negligence is proved, could recover the identical losses. This anomalous result subverts the whole rationale purportedly justifying the imposition of the public figure's actual malice standard in the suit brought by the corporation.

*News, Inc. et al., supra,* and the Oregon Supreme Court, in the same case on further appeal, held that a corporate bank was not a public figure subject to the difficult and almost impossible burden of proving constitutional actual malice. The Oregon Supreme Court succinctly stated, "Merely opening one's doors to the public, offering stocks for public sale, advertising, etc., even if considered a thrusting of one's self into matters of public interest, is not sufficient to establish that a corporation is a public figure." 298 Or. at 443, 693 P.2d at 42. That court further said, "The Bank of Oregon does not present that 'exceedingly rare' instance of an entity which is a public figure for all purposes. We find that the bank does not have 'general fame or notoriety' in the community in which the article was published nor does it exhibit 'pervasive involvement in the affairs of society.'" 298 Or. at 444, 693 P.2d at 42. I suggest that if a highly regulated corporate bank which sells stock, solicits deposits, makes loans, administers trusts and advertises all of these functions is not a public figure, neither is the Bond Fund nor MFM.

In support of its assertion that public regulated corporations are public figures for the purpose of defamation actions, the majority relies on cases I deem to be distinguishable. For example, the situation existing in *Reliance Insurance Co. v. Barron's,* involved a billion dollar, publicly held corporation proposing a $50 million stock offering. The *Reliance* court relied heavily on the fact of the plaintiff's size and public ownership as well as its being subject to close regulation. *American Benefit Life Insurance Co. v. McIntyre,* 375 So.2d 239 (Ala.1979), involved an article on a report by the state insurance commissioner questioning the solvency of the insurance company, and *Trans World Accounts, Inc. v. Associated Press,* 425 F.Supp. 814 (N.D. Cal.1977), concerned the factual report of a proposed administrative complaint by the Fair Trade Commission against the libel plaintiff. Bond Fund was not a multi-million dollar widely held public corporation, nor did the Star's article relate to investigations by public authorities of any violations of law by the Bond Fund. The registration requirements as well as the contents of its prospectus and sales materials for the Bond Fund had been approved by appropriate governmental authorities.

Moreover, in my opinion the majority's broad holding leaves unanswered many questions of when a corporate libel plaintiff may be held to be a limited purpose public figure. For example, are the "mom and pop" corporate drug, firearm or liquor stores, all operating in highly governmental regulated areas, to be held to be public figures? How would the court deal with a small corporation containing divisions, some of which are highly regulated by the government, and some of which are not? Do equal protection problems lurk in holding that some small corporations, because they are subject to no or minimal government regulation, need only to prove negligence, while others more closely regulated are deemed to be limited purpose public figures? These and many other questions remain unanswered by the court's opinion that seems to be primarily based on the premise that highly regulated corporations are limited purpose public figures.

Admittedly, any enunciated test for determination when a corporation is a limited purpose public figure for purposes of a defamation action may leave unanswered questions. I suggest it is more appropriate to determine the issue on an *ad hoc* basis, which, at a minimum, would encompass an analysis of such factors as capitalization, debt, the number and breadth of public stock ownership, the entity's share of the market, the subject matter of the story, and, perhaps other considerations. When the corporate plaintiff is subject to extensive governmental regulations, and when its business activities have been approved by the governmental agencies, in my view, there is even less reason to give the factor of governmental regulation much weight in the analysis.

In this case both Bond Fund and MFM were newly incorporated at the time of the article. The Bond Fund had no assets or liabilities at the time of the publication,

and, in fact, could not commence operations until the required $1 million minimal capitalization required by the Minnesota securities law was raised. This requirement in and of itself was for the protection of investors. MFM assets consisted solely of capitalized expenses, all of which had been advanced by Jadwin, incurred in connection with its incorporation, registration as an investment advisor, and promotion of the Bond Fund.

The majority seeks to justify the incongruent results (that permits Jadwin to recover on a negligence theory even though, for practical purposes, his individually owned corporations will most likely not be able to recover), by indicating that with respect to corporations like Bond Fund and MFM, the imposition of the proof of constitutional actual malice test will encourage the media to probe the business world "to the depth necessary to permit the kind of business reporting vital to an informed public." With the general proposition that the media should "probe the business world," I do not disagree, and, indeed, think it is laudatory that it does. But, I submit that is not the issue. The issue is whether they can do so negligently and irresponsibly so long as they do not act with constitutional actual malice and thus escape the liability for negligence to which practically all other persons and segments of our society are bound.[5] I am not unmindful of the need for robust and untrammeled debate on public issues and investigative journalism of newsworthy events.

In cases involving governmental officials and others who have thrust themselves into the vortex of the public arena, our courts, recognizing the value of vigorous press coverage, have made the media's accountability lower. In all other cases, I would hold the negligence standard applicable. I

fail to see how either Bond Fund or MFM has thrust itself into the public arena. Accordingly, I would hold that both are private individuals for the purpose of this libel action, and should only carry the burden of proving negligent publication.

PETERSON, Justice.

I join in the dissent of Justice Kelley.

YETKA, Justice.

I join in the dissent of Justice Kelley.

---

5. In rebuttal to an article written by columnist William Safire (November 20, 1984) advocating the constitutional actual malice test in all libel actions, Arnold H. Ismach, an associate professor in the University of Minnesota's School of Journalism and Mass Communication, wrote "A standard this charitable is found nowhere in the law or the Constitution. Negligence and recklessness have their price. It is society's way of telling us that we have to perform to certain standards when the lives or reputation of others are involved. Otherwise, what would inhibit the reckless driver, the abusive policeman, the careless dog owner, the custodian of an icy sidewalk? Should they be able to claim absence of malicious intent as absolution?" A. Ismach, *Good Faith is a Bad Test for Media*, Minneapolis Star & Tribune, Dec. 4, 1984, at 15A, Col. 1.