Argued November 6, 1973, reversed March 21, 1974

POST, *Respondent, v.* OREGONIAN PUBLISHING
COMPANY ET AL, *Appellants.*

519 P2d 1258

*James H. Clarke,* Portland, argued the cause for appellant Oregonian Publishing Company. With him on the briefs were Dezendorf, Spears, Lubersky & Campbell, James H. Clarke, George L. Kirklin, and Richard H. Williams, Portland.

*Ernest Bonyhadi,* Portland, argued the cause for appellant Associated Press. With him on the briefs were Rives, Bonyhadi & Drummond and Leonard A. Girard and Ivan Lewis Gold of Portland, and Royall, Koegel & Wells and Richard N. Winfield and James M. Ringer of New York.

*William Frye,* Eugene, argued the cause for respondent. On the brief were Husband, Johnson & Frye, Eugene.

O'CONNELL, C. J.

This libel action arises out of a news story which erroneously linked plaintiff with an attempt to smuggle drugs into the United States. Defendants appeal from a jury verdict in plaintiff's favor.

On July 18, 1970, an airplane which had allegedly contained substantial quantities of marijuana was abandoned near Beaver Marsh in southern Oregon.

The plane and its passengers had escaped shortly before from police in Reno, Nevada. These events led the State Police in Klamath Falls to publish an All-Points Bulletin (APB). The bulletin was headed "INFORMATION NARCOTICS SUSPECTS" and related the events surrounding the Reno escape. In addition, it stated that two men had occupied the airplane. The APB identified one of them by name and stated that he "IS ACCOMPANIED BY ANOTHER MALE SUBJECT DESCRIBED AS WMA 5 FT 9 IN 165 LONG DARK HAIR DARK COMP." Ten lines later appeared the following:

"THIS OFFICE IS OF THE OPINION THAT THE SECOND UNIDENTIFIED SUBJECT INVOLVED COULD BE JOHN CHARLES POST, OWNER OF THE TOWN AND COUNTRY MOTEL AT CHEMULT, OREGON. POST DESC AS DOB 9-4-32 6 FT 200 POUNDS BLACK HAIR QUITE LONG SIDEBURNS BLUE EYES DARK COMP. IN THE PAST HE HAS BEEN SUSPECTED OF FLYING NARCOTICS INTO THIS AREA. SUBJECT MAY NOW BE LIVING AT 4071 DONALD ST. APT A EUGENE, OREGON."

The APB concluded with the statement: "NO WARRANTS ON FILE AT THIS TIME."[1] In fact, Post

---

[1] The full text of the APB was as follows:
"0058 KFO OROSP36 7-18-70
APB OREGON CALIFORNIA WASHINGTON NEVADA INFORMATION NARCOTICS SUSPECTS
AT 0224 DATE THIS OFFICE RECEIVED INFORMATION VIA RADIO FROM CHP YREKA CALIF THAT RENO NEVADA PD HAD ATTEMPTED TO HALT AN AIRCRAFT SUSPECTED OF TRANSPORTING NARCOTICS AND HAD FIRED SHOTS AT THE AIRCRAFT. PLANE DESCRIBED AS RED WHITE AND BLACK PIPER AZTEC 6 PLACE NUMBER 5781Y. OCCUPIED BY TWO MEN. THIS OFFICE HAS BEEN IN TOUCH BY TELEPHONE WITH AGENT BILL MEGLEN US CUSTOMS, LOS ANGELES, CALIF. AND THE FOLLOWING INFORMA-

had absolutely no connection with this episode. His physical description contained in the APB, however, was accurate. There was no evidence at trial concerning the source of this information.

The origin of the defamatory news stories was an Associated Press dispatch from Reno. It described the police attempt to apprehend the airplane and its subsequent discovery at Beaver Marsh. Plaintiff's name did not appear in this dispatch. The Oregonian

TION WAS OBTAINED. THIS AIRCRAFT WAS RENTED FROM HILLSBORO AVIATION, HILLSBORO, OREGON BY JAMES STEED, WMA, DOB JULY 1935, 6 FT, 185 POUNDS, BROWN, BROWN ADDRESS 11432 41 ST ST, DRIVE, N.E. MARYSVILLE WASHINGTON SUBJECT IS A PILOT ON LEAVE FROM UNITED AIR LINES AND IS NARCOTICS SMUGGLING SUSPECT. STEED IS ACCOMPANIED BY ANOTHER MALE SUBJECT DESCRIBED AS WMA 5 FT 9 IN 165 LONG DARK HAIR DARK COMP. PLANE WAS OBSERVED LAST NIGHT NEAR MEXICAN BORDER AND IS BELIEVED LOADED WITH MARIJUANA AND POSSIBLY OTHER NARCOTICS. WHEN PLANE WAS GASSED SEVERAL BOXES WERE OBSERVED IN THE REAR PART OF THE PASSENGER COMPARTMENT.

THIS AIRCRAFT HAS BEEN LOCATED THIS AM PARKED ON THE RUNWAY OF THE AIRSTRIP AT BEAVER MARSH SOUTH OF CHEMULT, OREGON AND IS NOW UNDER SURVEILLANCE BY OSP OFFICERS. THE PLANE IS LOCKED AND NO BOXES CAN BE OBSERVED INSIDE. IT HAS BULLET HOLES IN LEFT SIDE WINDOWS. DUAL WHEELED VEHICLE TRACKS ARE APPARENT NEAR THE PLANE AND IT APPEARS THAT THE CARGO HAS BEEN LOADED INTO A VEHICLE.

THIS OFFICE IS OF THE OPINION THAT THE SECOND UNIDENTIFIED SUBJECT INVOLVED COULD BE JOHN CHARLES POST, OWNER OF THE TOWN AND COUNTRY MOTEL AT CHEMULT OREGON. POST DESC AS DOB 9-4-32 6 FT 200 POUNDS BLACK HAIR QUITE LONG SIDEBURNS BLUE EYES DARK COMP. IN THE PAST HE HAS BEEN SUSPECTED OF FLYING NARCOTICS INTO THIS AREA. SUBJECT MAY NOW BE LIVING AT 4071 DONALD ST APT A EUGENE, OREGON. AGENT MEGLEN, ADVISES THAT HE WILL FLY TO BEAVER MARSH THIS DATE TO CONTINUE THEIR INVESTIGATION NO WARRANTS ON FILE AT THIS TIME.
BOUEY    2ND LT
OREGON STATE POLICE    KLAMATH FALLS OREGON 1100"

received this dispatch through normal wire service channels. Richard Johnston, an assistant city editor, found the story on his desk when he arrived at work at 5:00 P.M. on July 18. He testified that because some of the described events occurred in Oregon he considered the story to have substantial local interest. He therefore assigned several reporters to seek additional information. Mr. Johnston also made inquiries on his own, but learned little.

During this time, Allen Nachman, an Associated Press reporter at the Portland bureau office, which at the time was located in the Oregonian building, made several telephone calls to the Klamath Falls State Police office. Like Johnston, he gained no new information.

Around 8:00 P.M., an Oregonian police reporter, Joe Frazier, began to work on the story. Frazier was at the Portland police station. From there, he called the State Police office in Milwaukie and was informed of the existence of the APB. Frazier testified that the person he spoke with told him plaintiff was named in the APB. Frazier relayed this information to Johnston, who told him to read the APB personally. The Portland police had received a copy of the APB through the regular police network and Frazier read it there. He then transmitted plaintiff's name to Johnston again.

Johnston in the meantime had drafted a front page story based on the Associated Press dispatch. To the information contained in it he added the fact that an APB had been issued. He testified that he called the Klamath Falls State Police, but that the officer to whom he spoke was not authorized to release the names of the suspects. Therefore, he wrote an article, omitting

plaintiff's name, which appeared in the first and second editions of The Sunday Oregonian of July 19, 1970.

Nachman testified that about 10:30 P.M. he called the Klamath Falls State Police, recited the information he had gained from Johnston as to the contents of the APB, and asked the officer to whom he spoke to confirm it. Nachman stated at trial that the officer, whose name he could not recall, did so. To the contrary, State Police Sergeant William Hazelwood, who answered all incoming calls that evening, denied that he had confirmed any such information to anyone.

Both Nachman and Johnston testified that after Nachman's call to Klamath Falls he told Johnston that the State Police had confirmed the APB information. As a result, Johnston testified, he amended the galley proofs of his original story to include plaintiff's name and the fact that "the U. S. Bureau of Customs had asked for the apprehension" of plaintiff. This story appeared in the third and fourth editions of The Sunday Oregonian. The Associated Press sent this story over its wire service and at least one member newspaper, The Eugene Register-Guard, published it in a late edition of its Sunday paper.

On Monday, July 20, it became known that plaintiff had had absolutely no involvement in this smuggling incident. Plaintiff sent a letter to both defendants and the Register-Guard on July 20, demanding retraction as provided in ORS 30.160 and ORS 30.165. The Register-Guard then printed an article which apparently satisfied plaintiff. The Associated Press, however, sent no such story to its members. The Oregonian, on Wednesday, July 23, 1970, published an article which appeared in a different location on the front

page and under a headline of smaller type-size than had the original defamatory story. In this article, The Oregonian admitted its error and apologized to plaintiff.

Defendants base their defense on two principal grounds: (1) that under the principles announced in *New York Times Co. v. Sullivan,* 376 US 254, 84 S Ct 710, 11 L Ed2d 686, 95 ALR2d 1412 (1964) and *Rosenbloom v. Metromedia,* 403 US 29, 91 S Ct 1811, 29 L Ed2d 296 (1971) they were protected in the publication of this defamatory story, and (2) that they published a legally sufficient retraction in compliance with ORS 30.160 which barred plaintiff from recovering compensatory damages.

*New York Times v. Sullivan, supra,* as extended by *Rosenbloom v. Metromedia, supra,* established the principle that the news media are shielded by the First Amendment from liability for the publication of a defamatory story about a subject of public or general interest, unless published with " 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not."[2]

Plaintiff contends that this principle is not applicable to the present case so as to excuse defendants in publishing the defamatory statement. Plaintiff does not argue that the drug smuggling incident reported in defendants' news stories was not a subject of public or general interest; rather, he argues that the *New York Times* doctrine should provide protection only when the defendant defames a person who actually "is involved" in the episode reported. He reasons that

[2] New York Times v. Sullivan, 376 US 254, 279-280, 84 S Ct 710, 726, 11 L Ed2d 686, 706, 95 ALR2d 1412, 1435 (1964); Rosenbloom v. Metromedia, 403 US 29, 31, 91 S Ct 1811, 1814, 29 L Ed2d 296, 305 (1971).

since in this case he in fact had nothing to do with the alleged smuggling venture, he was not "involved," and thus he should not have to prove that the stories were published with actual knowledge of their falsity or with reckless disregard of whether they were true or not.[3]

■ We cannot accept this argument. To so limit the *New York Times* principle would render it practically meaningless, for it is precisely because the plaintiff is not involved in the actual event as reported that a news story is defamatory, and it is in this situation that the news media, acting without malice, needs constitutional protection. As the Court points out in the *New York Times* case, constitutional protection is necessary in such cases "if the freedoms of expression are to have the 'breathing space' that they 'need * * * to survive.' "[4] No constitutional protection is needed when the allegedly defamed person is actually involved in the reported episode because in that case, the statutory defense of truth is adequate protection.[5]

In the present case, although plaintiff was not "involved" in the sense that he took part in the incident reported, he was involved in the story of that incident because the State Police had identified him in the APB as a possible participant. It was his involvement in the latter sense which invokes the *New York Times* standard and bars his recovery in the absence of proof of defendants' wilfulness or recklessness.

Plaintiff further contends that even if it is assumed that he was "involved" and that the *New York Times* principle is applicable, defendants are liable because the defamatory news stories were in fact pub-

---

[3] *Ibid.*
[4] *Id.* at 271-72.
[5] ORS 16.530 (2).

lished with knowledge of their falsity or with a reckless disregard for their truth or falsity.

■ It must be borne in mind at the outset that it is for the court, and not the jury, to decide where the line is to be drawn between a protected and an unprotected defamatory publication.⑥ To this end we review the record to determine whether the evidence raises a jury question on the issue of malice.⑦ Tested by the constitutional standard which lifts the protection of the First Amendment only if it is shown with "con-

---

⑥ In New York Times v. Sullivan, *supra,* 376 US at 285, the Court said: "This Court's duty is not limited to the elaboration of constitutional principles; we must also in proper cases review the evidence to make certain that those principles have been constitutionally applied."

In drawing the line between speech unconditionally guaranteed and speech which may legitimately be regulated, "the rule is that we 'examine for ourselves the statements in issue and the circumstances under which they were made to see * * * whether they are of a character which the principles of the First Amendment, as adopted by the Due Process Clause of the Fourteenth Amendment, protect.' Pennekamp v. Florida, 328 US 331, 335, 90 L ed 1295, 1296, 66 S Ct 1029; see also One, Inc. v. Olesen, 355 US 371, 2 L ed 2d 252, 78 S Ct 364; Sunshine Book Co. v. Summerfield, 355 US 372, 2 L ed 2d 352, 78 S Ct 365. We must 'make an independent examination of the whole record,' Edwards v. South Carolina, 372 US 229, 235, 9 L ed 2d 697, 702, 83 S Ct 680, so as to assure ourselves that the judgment does not constitute a forbidden intrusion on the field of free expression." New York Times v. Sullivan, 376 US 254, 285, 84 S Ct 710, 11 L Ed2d 686, 709 (1964).

⑦ "* * * 'This Court cannot avoid making an independent constitutional judgment on the facts of the case.' * * * The simple fact is that First Amendment questions of 'constitutional fact' compel this Court's de novo review. * * * Our independent analysis of the record leads us to agree with the Court of Appeals that none of the proofs, considered either singly or cumulatively, satisfies the constitutional standard with the convincing clarity necessary to raise a jury question whether the defamatory falsehoods were broadcast with knowledge that they were false, or with reckless disregard of whether they were false, or not." Rosenbloom v. Metromedia, 403 US 29, 54-55, 91 S Ct 1811, 29 L Ed2d 296, 318 (1971).

vincing clarity"[9] that the story was published with knowledge that it was false or with reckless disregard of whether it was false or not, we hold that the record does not justify the withdrawal of constitutional protection.

■ Plaintiff alleges several bases which he claims justify a verdict based upon "actual malice." In the first place, he contends that the defendants had no basis for reporting that plaintiff was a suspect and that he was being sought by the police. We do not think that this is a fair reading of the APB. As noted above, the bulletin is headed "Information Narcotics Suspects." It later states that "This office is of the opinion that the second unidentified subject involved could be John Charles Post * * *." It goes on to say that "In the past he has been suspected of flying narcotics into this area." We regard this as a clear expression of opinion that plaintiff was one of the suspects involved in the incident.

It is not as clear from the bulletin that the police were trying to apprehend plaintiff, but we believe that it is a fair inference to be drawn from a reading of the whole bulletin. We have the indication that plaintiff was regarded as a suspect by the police. The APB purports to describe him so that the police officers would be able to identify him. This would seem to indicate that he was to be picked up for questioning at least.

Learning from the APB that the Reno police had attempted to halt the aircraft in which plaintiff was suspected of being an occupant and that in the past plaintiff had been "suspected of flying narcotics into this area," a police officer would, we think, consider

---

[9] *Ibid.*

this a reasonable basis for seeking out plaintiff. The Eugene police did, in fact, arrest plaintiff the following morning in connection with the incident.

Even assuming that the APB when closely read does not say that plaintiff was actually being sought, the bulletin is so written that it could well convey that idea to one reading it with less scrutiny. As we have already indicated, the APB clearly suggested the likelihood that plaintiff had been involved in the incident. A fair reading of the APB leaves the impression that plaintiff was one of the suspects. The whole tone of the bulletin was that the "suspects" were being pursued by the police. The description of Steed and the plaintiff was given. All of this could well suggest to one reading the APB that the two suspects were being sought by the authorities. If this was a misreading of the APB, it would constitute at most negligent conduct rather than recklessness in making the misstatement.

■ Plaintiff attaches significance to the fact that Mr. Nachman of the Associated Press made several telephone calls to the State Police office in Klamath Falls to verify the statements made in the APB. We can find nothing in the evidence relating to those calls which could form the basis for a charge of reckless conduct. The calls were made to get confirmation that Steed and Post were named in the APB. The calls were not made to determine whether Steed or Post, if named, were in fact involved. Whether the inquiry was made in terms of whether the police were seeking the suspects or whether the suspects were named in the bulletin is immaterial insofar as it reflects upon the question of recklessness. As we have already indicated, the APB itself could be interpreted as calling for the apprehension of Steed and plaintiff. The attempt to

verify this or any other matter was made for the purpose of confirming or clarifying what was then known by the press. Plaintiff seems to argue that from this the jury could infer that since defendants thought that further confirmation was important, the publication of the story without obtaining it was reckless. That inference would be reasonable only if the APB did not in itself constitute an adequate news source warranting the publication of the story. Since, in our opinion, it was an adequate source, the further inquiry made by defendants would be irrelevant on the issue of malice.

Inasmuch as defendants are protected by the First Amendment, it is not necessary to address the question argued in the briefs as to whether the story based on the APB also enjoyed a qualified privilege as a substantially correct report of a public agency. Nor is it necessary for us to decide whether the retraction published by the defendant Oregonian was, as defendant argues, sufficient as a matter of law.

The judgment of the trial court is reversed.