Argued and submitted August 8, 2008, reversed and remanded with instructions to reinstate the jury's verdict January 27, 2010

Tim TUBRA,
an individual,
*Plaintiff-Appellant,*

*v.*

John Michael COOKE
and Ron Swor, individuals;
and the International Church of the Foursquare Gospel,
a California nonprofit corporation,
*Defendants-Respondents.*

Multnomah County Circuit Court
050910015; A134332

225 P3d 862

Christopher G. Lundberg argued the cause for appellant. With him on the briefs were Shay S. Scott, Matthew E. Malmsheimer, and Haglund Kelley Horngren Jones & Wilder LLP.

John T. Kaempf argued the cause for respondents. With him on the brief were Ronald E. Bailey and Bullivant Houser Bailey P.C.

Before Wollheim, Presiding Judge, and Armstrong, Judge, and Riggs, Senior Judge.

ARMSTRONG, J.

## ARMSTRONG, J.

This case arises from a defamation claim that plaintiff, a former interim pastor, brought against his employer church and two of its officials, and that ultimately resulted in a jury verdict and award of damages in plaintiff's favor. Plaintiff appeals the subsequent post-verdict judgment granting defendants' motion for judgment notwithstanding the verdict (JNOV), in which the trial court concluded that the Free Exercise Clause of the First Amendment to the United States Constitution deprived it of jurisdiction to adjudicate the dispute. The issue on appeal is one of first impression for Oregon appellate courts: whether the First Amendment bars recovery for a plaintiff in a claim of defamation that arose from defendants' statements that plaintiff had misappropriated church funds and was dishonest during his time as pastor. We conclude that, under the circumstances presented here, the First Amendment does not bar plaintiff's claim. Accordingly, we reverse.

When reviewing a grant of a JNOV motion, we review the trial evidence in the light most favorable to the party who prevailed before the jury. *Bennett v. Farmers Ins. Co.*, 332 Or 138, 147-48, 26 P3d 785 (2001). In this case, that is plaintiff. We state the facts in accordance with that standard.

Plaintiff had been a pastor for various congregations within the International Church of the Foursquare Gospel (the church) since 1981. As of 2003, he was the associate pastor at the Columbia City Foursquare Church, where defendant Cooke was a senior pastor. Cooke also served as a divisional superintendent, which required him to match prospective pastors with vacancies in congregations within his district.

In September 2003, the Columbia City church was experiencing financial difficulties, and, as a result, Cooke laid off plaintiff. Cooke offered plaintiff a position as pastor in Vernonia, which was roughly a one-hour drive from Columbia City. Plaintiff was unenthusiastic about the prospective position in Vernonia and explained to Cooke that he had concerns about the salary, health insurance coverage, and lack of opportunities to supplement his income in such a small town.

Moreover, plaintiff told Cooke that taking the position in Vernonia would sidetrack him from his long-expressed goal of founding a Foursquare church in Hillsboro.

Despite plaintiff's misgivings, Cooke and defendant Swor, the district supervisor, continued to discuss the opportunity at Vernonia with plaintiff. They offered him a monthly salary of $1,500, which was the amount that the Vernonia church council indicated that it could afford to pay plaintiff; a subsidy of an additional $1,100 per month for plaintiff's first three months (totaling $3,300) to match the salary that the outgoing pastor had received; and health care coverage for up to six months. Swor and Cooke indicated that the health insurance coverage and salary subsidies were "free gifts" that plaintiff had no obligation to repay; they also indicated to plaintiff, orally, that beyond the six-month promise of health insurance coverage, they "would not leave him uncovered" for health benefits if the Vernonia church could not pick up that expense.

Plaintiff eventually accepted the position, but emphasized to Cooke and Swor that he wished to be considered an interim pastor at Vernonia. Plaintiff stated that Cooke had encouraged him to approach the position on a "rent-to-own" basis and speculated that perhaps plaintiff would change his mind about staying permanently once he arrived there. Plaintiff agreed to keep an "open mind" about the situation but continued to assert to Swor and Cooke that he was taking the position on an "interim" basis.

From his first day at the Vernonia church, plaintiff felt that "some deception was taking place" toward the Vernonia church's council and congregation by Cooke and Swor regarding plaintiff's interim status. For plaintiff's first service, Cooke sent a letter of introduction to be read to the congregation by one of the Vernonia council members, announcing "the appointment of [plaintiff] as the pastor of the Vernonia Foursquare Church." That introduction "shocked" plaintiff and his wife; they had never been introduced to a new congregation with such a letter, and they both believed that the letter misled the congregation into believing that plaintiff was the congregation's permanent pastor.

Plaintiff did not tell the congregation of his intention to remain only temporarily at Vernonia; however, plaintiff immediately called Swor about the letter and, later, met with Cooke to discuss plaintiff's concerns about his status at Vernonia. Soon after that meeting, plaintiff called Swor and told him again that he did not wish to remain at Vernonia on a long-term basis. Swor followed up with a letter stating that plaintiff's health insurance would continue to be covered for up to six months, that Swor would send a check for $3,300 to subsidize plaintiff's first three months of salary, and that those gifts would not be expected to be repaid in any way. The letter further indicated that the understanding between Swor, Cooke, and plaintiff was that plaintiff was not staying on permanently, but that plaintiff would not be referred to as "interim" and communication with the Vernonia council would remain as it was.

In April 2004, plaintiff, with the Vernonia council's knowledge, withdrew $3,000 from the church account. He discussed that transaction with the council, explaining that the money had been earmarked for him as a gift. The council accepted that explanation and issued the check in accordance with its normal procedures, including having two individuals (in this instance, plaintiff and a council member) sign the check. The expenditure was further documented in expense reports that were sent to the district offices. Plaintiff subsequently deposited that check into a personal checking account and wrote four checks against that amount totaling $1,844.16 to cover health insurance premiums.

In June 2004, plaintiff, Cooke, and Swor informed the Vernonia council that plaintiff was only a temporary pastor, and that they were looking for a new pastor to take over the congregation. On July 11, plaintiff told the congregation that he would be leaving. On August 17, Cooke told plaintiff that he had found a new pastor for the Vernonia church and that plaintiff would be transitioned out over the next 30 days.

On August 31, Cooke met with the Vernonia council to discuss the transition with the new pastor. Part of the transition process required the council or superintendent to review the accounting; the Vernonia council's bookkeeper had done so and, at that meeting, asked Cooke to take a look

at the April 2004 transaction for $3,000 and let her know if there was a problem with it. Cooke immediately contacted Swor about that transaction, and, on September 15, Swor met with plaintiff about it, telling him that he was being charged with "misappropriation of church funds" for the $3,000 withdrawal, and asked plaintiff for an explanation of the withdrawal. Plaintiff testified that that was the first he had heard of the allegations, that he was "shocked" by Swor's accusation, and that it had come "out of nowhere," and, as a result, he was unable to respond and ended the meeting. Two days later, Swor's secretary called plaintiff and informed him that he "was done at Vernonia" and "to pack [his] bags and leave," which he did.

On October 19, plaintiff had a phone conversation with Swor about the charges of misappropriation; Swor memorialized the "points of agreement" from that discussion in a letter dated November 9, 2004. In those points, plaintiff agreed to return the $3,000 to the Vernonia church through the district office, "as that money was intended for the subsidy of the church for your salary for the first three months of employment there and not to be taken over and above your salary." Furthermore, the letter indicated that, because plaintiff had not chosen to seek reappointment in a Foursquare Church, his license to be a Foursquare pastor would be suspended until he chose to request reinstatement.

In the meantime, Swor and Cooke drafted a letter that Swor read aloud to the Vernonia congregation. Swor and Cooke testified that they wanted to inform the congregation about the circumstances of plaintiff's departure because it "had a right to know what was happening" and because they wanted to avoid speculation and rumors regarding plaintiff and the April transaction. In that letter, Swor explained that, "[t]hrough communication between the district staff and the church council, and a review of the church books and council minutes, it is now evident that there has been, to some extent, a financial misappropriation by former pastor [plaintiff]." That letter also indicated that plaintiff had taken the position in Vernonia on the express condition that he would consider a long-term stay there, that he had told the district in November 2003 that he was not interested in remaining at the church for longer than six months to a year, that he

requested the district not look for another pastor until he was ready to leave, and that they respected plaintiff's wishes to not tell the congregation or council that plaintiff was anticipating leaving the Vernonia church. Finally, the letter indicated that, after discussing the matter with the district, plaintiff had agreed to return the $3,000 in question to the church. It closed by saying, "Where it is not the intention of the district to harm anyone's personal reputation, it is sometimes important to bring difficult issues to the light, so that nothing will hinder the future work of the church."

Plaintiff was unaware of the letter until shortly after Swor read it to the Vernonia congregation, when two congregants confronted him on separate occasions. The first occurred while he visited the home of a Vernonia congregant and that congregant accused him of stealing funds from the church. In the second, a member of the Columbia City congregation approached him in a grocery store and asked him whether it was true that he had stolen funds from the church. Those interactions alarmed plaintiff; he was convinced that he had done nothing wrong and had expected that the issue would be resolved privately between him and the district. He elected not to pay back the $3,000 as he had previously agreed, because he believed that, by doing so, he would be admitting that he was guilty of misconduct. He also contacted Swor, individuals at the Vernonia church, and the International Foursquare organization requesting a copy of the letter that Swor had read to the congregation; they all refused his request. In the course of denying one of those requests, Cooke wrote in an e-mail to Swor's secretary, who had forwarded the request to Cooke, that plaintiff may have "want[ed] to stir up trouble. He has already demonstrated a willingness to lie and steal, and to purposely [sow] discord against the division."

Subsequently, plaintiff requested a meeting to have neutral leadership from the church hear both sides of the misappropriation issue. That meeting occurred in May 2005 and included a couple of pastors whom plaintiff claimed "were friends with [Cooke] and [Swor]." Plaintiff subsequently received a letter from Swor indicating that the group had concluded that plaintiff had misappropriated $3,000 above and beyond the $3,300 that the district had promised

to him but that, given his testimony that he had spent $1,500 on health insurance premiums, they were asking him to return only $1,500 of the funds "to bring [his] financial relationship with the church back to good standing."[1] At no point did Swor or anyone else indicate that they would take steps to restore plaintiff's reputation with the Vernonia or other Foursquare congregations.

Since that time, plaintiff, who is in his fifties, has been unable to find steady work as a pastor in any church, either within or outside of the Foursquare organization. Due to his loss of income, he sold his house and moved into a fifth-wheel trailer with his wife.

Plaintiff ultimately filed a complaint against Cooke, Swor, and the church (hereinafter collectively referred to as defendants) for, among other things, defamation based on the letter read to the congregation stating that plaintiff had misappropriated funds and on the e-mail in which Cooke described plaintiff's willingness to lie and steal.

Before trial, defendants moved for summary judgment, arguing, *inter alia*, that the allegedly defamatory statements were protected by a "First Amendment privilege." That motion was denied by letter opinion, which stated in part:

> "As to the claim that the First Amendment bars this action, I believe that the governing case law, including its application in Oregon, leads to the conclusion that plaintiff is not barred from seeking to protect his reputation on these facts. The issue here is not about doctrine or ecclesiastical processes. The First Amendment case law would be relevant if the action were for wrongful termination and the issue was whether the church organization had the power and right to end the pastorate of [plaintiff]. However, this case is not about the power or right to terminate, it is about statements and actions in the process of termination, including the secular process of handling money and communications regarding alleged mishandling of money."

---

[1] The $1,500 in health insurance premiums reflected in the letter is less than the $1,844.16 that plaintiff testified that he had paid for health insurance. It appears that plaintiff told the church representatives that he had written two $750 checks for health insurance premiums but had actually written four checks totaling $1,844.16 for that purpose: two $761.04 checks and two $161.04 checks.

At the close of the evidence, defendants moved for a directed verdict, renewing their argument that the claim was barred by the First Amendment and asserting, alternatively, that they were entitled to a directed verdict on the ground that the statements were qualifiedly privileged and plaintiff had failed to present sufficient evidence for a jury to find that the privilege had been abused.[2] The trial court denied the motion. The case then went to the jury, which was instructed on the law of qualified privilege.[3] The jury returned a verdict awarding damages to plaintiff, finding that defendants had defamed plaintiff and that they had abused the qualified privilege.

After a judgment was entered for plaintiff, defendants moved for judgment notwithstanding the verdict, ORCP 63, arguing that the First Amendment operated to deprive the court of jurisdiction over the defamation claim. After a hearing, the trial court concluded that "this case is absorbed in this relationship between the Foursquare Gospel Church and * * * [p]laintiff as an employment relationship, and I think that's what the current cases speak to." The trial court granted defendants' motion and entered a judgment to that effect. Plaintiff appeals that judgment.

██ To establish a claim for defamation, a plaintiff must show that the defendant made a defamatory statement about the plaintiff to a third person. *Wallulis v. Dymowski*, 323 Or 337, 342-43, 918 P2d 755 (1996). A defamatory statement is a false statement that would subject the plaintiff "to hatred, contempt or ridicule * * * [or] tend to diminish the esteem, respect, goodwill or confidence in which [the plaintiff] is held or to excite adverse, derogatory or unpleasant feelings or opinions against [the plaintiff]." *Farnsworth v. Hyde*, 266 Or 236, 238, 512 P2d 1003 (1973) (internal quotation marks

---

[2] The cases use the terms "qualified privilege" and "conditional privilege" interchangeably; we refer to it as a qualified privilege in this opinion.

[3] That instruction read, in part:

"If you find that the plaintiff has proved by a preponderance of the evidence that defendants[ ] abuse[d the] privilege because defendants did not have objectively reasonable grounds for making their defamatory statements[,] did not believe those statements to be true[,] or made them for a purpose unrelated to the defendants' stated purpose, then the defendants are not entitled to the qualified privilege defense."

omitted; ellipses and first bracketed material in original, others added).

■■ Oregon law recognizes the defenses of absolute privilege and qualified privilege to claims for defamation. An absolute privilege is a bar to the claim, *see Moore v. West Lawn Mem'l Park*, 266 Or 244, 249, 512 P2d 1344 (1973) ("When defamatory matter is absolutely privileged no cause of action exists * * *."); however, the Supreme Court has determined that an absolute privilege applies in only a narrow range of circumstances, *DeLong v. Yu Enterprises, Inc.*, 334 Or 166, 171, 47 P3d 8 (2002). As the court explained in *Wallulis*, the absolute privilege applies when "the public's interest in the unhampered operation of the government, when exercising such functions, outweighs an individual's interest in the preservation of reputation." 323 Or at 349. Thus, for example, statements made as part of judicial and quasi-judicial proceedings are absolutely privileged. *See, e.g.*, *Binder v. Oregon Bank*, 284 Or 89, 91, 585 P2d 655 (1978).

■■ A qualified privilege, by contrast, generally "exists to protect three kinds of statements: (1) those made to protect the defendant's interests; (2) those made to protect the employer's interests; or (3) those made on a subject of mutual concern to the defendant and the persons to whom the statement was made." *DeLong*, 334 Or at 170 (citing *Wallulis*, 323 Or at 350). A qualified privilege is not an absolute bar to a defamation claim but, rather, requires the plaintiff to prove that the defendant abused the privilege. *Wallulis*, 323 Or at 348. Abuse occurs and the privilege is lost "if the publisher disbelieves or lacks reasonable grounds to believe that the defamatory statement is true, if the statement is made for purposes outside the scope of the privilege, if the statement is made to someone who is not reasonably believed to be necessary to accomplish the purpose of the privilege, or if the statement includes defamatory matter that is not reasonably believed to be necessary to accomplish the purpose of the privilege." *Lewis v. Carson Oil Company*, 204 Or App 99, 104, 127 P3d 1207, *rev den*, 341 Or 245 (2006) (citing *Benassi v. Georgia-Pacific*, 62 Or App 698, 703, 662 P2d 760, *adh'd to as modified on recons*, 63 Or App 672, 667 P2d 532, *rev den*, 295 Or 730 (1983)).

■        " '[T]he question of whether or not a defamatory statement is privileged, either absolutely or conditionally, depends upon the balance that the court strikes between competing interests.' " *Wallulis*, 323 Or at 348 (quoting *Lee v. Paulsen*, 273 Or 103, 105, 539 P2d 1079 (1975)). In *DeLong*, for example, the court examined that balance and concluded that a qualified, rather than absolute, privilege was appropriate to protect informal statements made to police officers in reporting a crime. 334 Or at 174. The court noted that, unlike in judicial proceedings where " '[i]t is essential to the ends of justice that all persons participating in judicial proceedings (to take a typical class for illustration) should enjoy freedom of speech in the discharge of their public duties or in pursuing their rights, without fear of consequences[,]' " *id.* at 173 (quoting Van Vechten Veeder, *Absolute Immunity in Defamation*, 9 Colum L Rev 463, 469 (1909)), citizen reports to police officers "should receive protection only if they were made in good faith, to discourage an abuse of the privilege." *Id.*

■        In this case, the First Amendment provides an additional analytical overlay, because the defamation claim involves statements made about a church pastor by church officials. Defendants argue that the trial court correctly granted their JNOV motion because the Free Exercise Clause prohibits the court from adjudicating plaintiff's defamation claim—in their words, that the court lacks jurisdiction over the claim. Given the above framework, we understand defendants to be arguing that the First Amendment thus operates to create an absolute privilege to plaintiff's claim of defamation.[4] Defendants do *not* argue that the JNOV was proper because the evidence is insufficient to

---

[4] Indeed, defendants framed this as a "First Amendment privilege" defense in their trial memorandum, summary judgment motion, and motion for directed verdict. Unlike a situation where the Free Exercise Clause provides immunity from suit, *cf. Mitchell v. Forsyth*, 472 US 511, 525-26, 105 S Ct 2806, 86 L Ed 2d 411 (1985) (immunity from suit under Free Exercise Clause entitles party to not stand trial or face litigation; that immunity is effectively lost if a case erroneously goes to trial), civil courts have jurisdiction to adjudicate torts involving religious organizations, *see Presbyterian Church v. Hull Church*, 393 US 440, 449, 89 S Ct 601, 21 L Ed 2d 658 (1969) ("[N]ot every civil court decision * * * jeopardizes values protected by the First Amendment."). The issue, thus, is not whether civil courts confronted with such torts have jurisdiction, but rather, more accurately stated, whether the First Amendment bars the relief sought by plaintiff.

support the jury's determination that defendants abused the qualified privilege. Thus, the issue presented is a question of law, which we review for errors of law. "It must be borne in mind at the outset that it is for the court, and not the jury, to decide where the line is to be drawn between a protected and an unprotected defamatory publication." *Post v. Oregonian Publishing Co.*, 268 Or 214, 222, 519 P2d 1258 (1974).

We turn to that issue. The First Amendment to the United States Constitution, made applicable to the states through the Fourteenth Amendment, states, in part, that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof."[5] The United States Supreme Court, in a line of cases beginning with *Watson v. Jones*, 80 US (13 Wall) 679, 20 L Ed 666 (1871), has interpreted the Free Exercise Clause to severely restrict the authority of civil courts to adjudicate disputes "on matters of discipline, faith, internal organization, or ecclesiastical rule, custom, or law." *Serbian Orthodox Diocese v. Milivojevich*, 426 US 696, 713, 96 S Ct 2372, 49 L Ed 2d 151 (1976). Courts have understood that principle to apply to church decisions involving the employment of ministers; the District of Columbia Court of Appeals, for example, described it as follows:

> "[C]ourts have consistently held that the Free Exercise Clause of the First Amendment prohibits judicial encroachment into church decisions where those decisions turn on church policy or on religious doctrine or practice. Except for contractual disputes, this prohibition includes church decisions concerning the employment of ministers because selection and termination of clergy is a core matter of ecclesiastical self-governance not subject to interference by a state."

*Heard v. Johnson*, 810 A2d 871, 882 (DC 2002) (citations omitted).

---

[5] The parties did not raise any issues under relevant provisions of the Oregon Constitution. Hence, we limit our analysis to the Free Exercise Clause of the First Amendment to the United States Constitution. *See State v. Mendez*, 308 Or 9, 19, 774 P2d 1082 (1989) (limiting discussion to the defendant's federal constitutional claim where he "failed to brief or argue any independent state constitutional theory").

However, the First Amendment does not completely bar relief sought by a plaintiff against a church in a civil action. *See, e.g., Jones v. Wolf*, 443 US 595, 99 S Ct 3020, 61 L Ed 2d 775 (1979) (applying "neutral principles" of law to resolve church property dispute where there was no need to examine church doctrine); *Presbyterian Church v. Hull Church*, 393 US 440, 449, 89 S Ct 601, 21 L Ed 2d 658 (1969) ("[N]ot every civil court decision * * * jeopardizes values protected by the First Amendment."); *Meshel v. Ohev Sholom Talmud Torah*, 869 A2d 343, 357 (DC 2005) (applying "neutral principles" approach to parties' contract dispute). Nor does it bar every employment-related suit involving a religious organization. *See, e.g., Minker v. Baltimore Annual Conf.*, 894 F2d 1354, 1359-60 (DC Cir 1990) (allowing claim arising from oral contract between church and pastor if claim was provable without inquiring into church doctrine); *EEOC v. Pacific Press Pub. Ass'n*, 676 F2d 1272, 1279 (9th Cir 1982) (First Amendment does not bar Civil Rights Act from being applied to editorial secretary in church publishing house); *Marshall v. Munro*, 845 P2d 424, 428 (Alaska 1993) (defamation claim by pastor against another church official allowed where the allegedly defamatory statements did not require court to examine qualifications required of pastors).

No United States Supreme Court case—or Oregon appellate case—specifically addresses the applicability of First Amendment protections to churches and other religious groups defending against allegations of defamation by a church pastor. In the few Oregon cases that have involved disputes over allegedly defamatory statements involving churches and other religious organizations, the appellate courts did not reach the question of First Amendment protection. *See Murphy v. Harty*, 238 Or 228, 239-40, 393 P2d 206 (1964) (defendant church did not file timely demurrer in defamation action by former minister); *Muresan v. Philadelphia Romanian Pentecostal Church*, 154 Or App 465, 474, 962 P2d 711, *rev den*, 327 Or 621 (1998) (defendant church failed to preserve its contention that allegedly defamatory statements were subject to an absolute constitutional privilege).

However, in *Christofferson v. Church of Scientology*, 57 Or App 203, 644 P2d 577, *rev den*, 293 Or 456 (1982), *cert den*, 459 US 1206, 1227 (1983), we considered whether the

First Amendment offered protections to a religious organization defending against a claim of fraud by a former member of the church.[6] Citing *Wisconsin v. Yoder*, 406 US 205, 215-16, 92 S Ct 1526, 32 L Ed 2d 15 (1972), we explained that "[t]he fundamental qualification for protection based on the Free Exercise Clause of the First Amendment is that that which is sought to be protected must be 'religious.' " *Christofferson*, 57 Or App at 239. We also observed that

> "[a] defense based on the Free Exercise Clause presents particular difficulties in an action for fraud. To establish fraud, a plaintiff must ordinarily prove that the representations made were false. * * * However, when religious beliefs and doctrines are involved, the truth or falsity of such religious beliefs or doctrines may not be submitted for determination by a jury."

*Id.* at 235-36 (citing *United States v. Ballard*, 322 US 78, 64 S Ct 882, 88 L Ed 1148 (1944); *Meader v. Francis Ford, Inc.*, 286 Or 451, 595 P2d 480 (1979)).

In *Christofferson*, the defendants requested that the trial court determine which of the alleged misrepresentations were religious and withdraw from the jury the issue whether those statements were true or false. *Id.* at 237. The trial court instead submitted that decision to the jury—that is, whether the allegedly fraudulent statements were religious—along with instructions that it was not to decide the truth or falsity of any statements that it found to be religious. *Id.* On appeal, the defendants argued that the trial court must "determine in the first instance the religious character of statements alleged to be fraudulent and that, if it is determined that the statements relate to religious beliefs or practices, further inquiry is forbidden." *Id.*

Following the approach taken by the court in *Founding Church of Scientology v. United States*, 409 F2d 1146 (DC Cir

---

[6] In *Christofferson*, the plaintiff had become a member of the Church of Scientology and paid for and participated in various courses and activities promoted by the church. 57 Or App at 207-08. The plaintiff later renounced her association with the church and sued both the local chapter and its governing organization for fraud, among other things, alleging that the church induced her to engage in the activities by making misrepresentations regarding the quality, benefits, and other characteristics of the activities in which she had engaged. *Id.* at 227-28.

1969), we concluded that the trial court was required to determine the religious character of the alleged misrepresentations only if it could do so as a matter of law—that is, only if the sole conclusion that could be drawn from the evidence was that the alleged misrepresentations were purely religious. *Christofferson*, 57 Or App at 238.

Determining whether a representation is purely religious as a matter of law, we held, involves three inquiries: First, is the defendant organization of a religious nature? *Id.* at 239-41. Second, do the statements themselves relate to the religious beliefs and practices of the organization? As we explained,

> "[i]t is clear that a religious organization, merely because it is such, is not shielded by the First Amendment from all liability for fraud. * * * If the statements involved here do not concern the religious beliefs and practices of the [religious organization], the Free Exercise Clause provides no defense to plaintiff's action."

*Id.* at 241 (citation omitted). Finally, even if the statements are made on behalf of a religious organization and have a religious character, are they nonetheless made for a "wholly secular" purpose? *Id.* at 242. On that point, we explained that some ideas—such as "the nature of a supreme being" and "the value of prayer and worship"—"must always and in every context be considered religious as a matter of law," but that others are "religious only because those espousing them make them for a religious purpose." *Id.* at 243-44.[7] *See also Checkley v. Boyd*, 170 Or App 721, 731, 14 P3d 81 (2000), *rev den*, 332 Or 239 (2001) (applying *Christofferson* analysis and holding that the defendants' free exercise defense did not provide a basis for dismissal of the plaintiff's intentional infliction of emotional distress claim because some of the plaintiff's allegations—such as allegations that the defendants had accused the plaintiff of physically abusing, stealing from,

---

[7] In *Christofferson*, we concluded that the latter inquiry presented a jury question—that is, there was evidence from which a jury could conclude that the representations were made for a wholly secular purpose—and, therefore, the trial court did not err in refusing to withdraw the statements from the jury. 57 Or App at 244. Although we held in the plaintiff's favor on that issue, we ultimately reversed and remanded for a new trial based on erroneous jury instructions related to the defendants' Free Exercise Clause defense. *Id.* at 248.

and neglecting his brother—would not "always and in every context" be considered religious in nature).

We see no reason why that test should not guide our analysis in this case as well—that is, in the context of a free exercise defense to a claim for defamation made by a pastor against his church. An action for defamation—like fraud—generally requires the plaintiff to prove that the representations made were false. We recognized in *Christofferson* that a defense based on the Free Exercise Clause presents "particular difficulties" in that situation because the provision prohibits a jury from inquiring into the truth or falsity of religious beliefs or doctrines. 57 Or App at 235-36. However, *Christofferson* demonstrates that the task is not impossible—rather, it provides an appropriate framework for ensuring that the jury will not be required to pass on the veracity of a defendant's religious beliefs in violation of the Free Exercise Clause, even when falsity is an element of the claim in question.

Defendants insist, however, that the "religious character" test of *Christofferson* is inapplicable, pointing out that its holding "that only 'purely religious' statements are protected by the First Amendment was *not* applied to defamatory statements about pastors in the context of an internal church dispute about their conduct as pastors." (Emphasis in original.) They argue that, because the plaintiff in *Christofferson* was a former church member, not a pastor, and her claims involved fraud and intentional infliction of emotional distress, rather than defamation, "[t]he issue of the Court becoming entangled in who 'speaks *for* the church' in the role of a *pastor* was not addressed."[8] (Emphasis in original.) In defendants' view, therefore, it is appropriate for us to consider cases from other jurisdictions that have considered the issue.

In particular, defendants urge us to follow the approach adopted by the District of Columbia Court of Appeals in *Heard*. In *Heard*, a pastor sued his employer

---

[8] In any event, defendants argue that the statements at issue in the present case "were not wholly secular because they were made solely to other Church members and concerned plaintiff's conduct while serving as a pastor."

church for wrongful eviction when the church became dissatisfied with his performance and voted to remove him. 810 A2d at 875. While that case was pending, the pastor remained in his position in the church, and members of the church wrote a manual documenting the reasons for the pastor's dismissal in accordance with its governance procedures. *Id.* The pastor then filed a complaint against the members for defamation based on the alleged publication of that manual. *Id.* at 875-76.

To resolve the question whether the defendants were entitled to the protection of the Free Exercise Clause in defending against that action, the court established the following rule:

> "[C]onstitutional protections afforded by the Free Exercise clause (prohibiting civil court interference in disputes between ministers and churches) extend to defamation claims, when: (1) such a claim flows entirely from an employment dispute between a church and its pastor so that consideration of the claim in isolation from the church's decision as to the pastor is not practical, (2) the alleged 'publication' is confined within the church, and (3) there are no unusual or egregious circumstances."

*Id.* at 885.[9]

We are not persuaded that that is the correct rule. The court in *Heard* correctly recognized that, although church decisions concerning the employment and termination of ministers implicate a "core matter of ecclesiastical self-governance," the church's autonomy in those matters is not absolute. *Id.* at 882. Instead, the court held, "weighing the free exercise protections against important state interests requires a 'delicate balancing.' " *Id.* at 883 (quoting *McDaniel v. Paty*, 435 US 618, 628 n 8, 98 S Ct 1322, 55 L Ed 2d 593 (1978)). In the case of a defamation claim arising out of a church's employment relationship with its pastor, the court concluded that that balance tips in favor of First Amendment protection for the church against such a claim to

---

[9] Applying that test, the court then determined that the plaintiff's claim could not be practically isolated from the employment dispute, and, hence, concluded that the First Amendment barred plaintiff's claim. *Heard*, 810 A2d at 885.

protect the church's ability to choose its leaders. *Id.* at 884-85. That is so, the court held, "because resolution of the claim would require an impermissible inquiry into the church's bases for its action." *Id.* at 883. In other words, in that situation, even though the alleged defamatory statements may not overtly express religious principles or beliefs, it would be impractical to consider the statements separately from the church's decision as to the pastor. *Id.*

However, the *Heard* court did not go so far as to hold that the First Amendment foreclosed civil courts from ever granting relief on a defamation claim arising between pastors and their churches—in other words, the court recognized that the First Amendment privilege is not absolute. First, the court appears to have limited its holding to defamation claims flowing "entirely from an employment dispute." *Id.* at 885. Moreover, it explicitly recognized that, even in a defamation claim arising out of an employment dispute, "unusual or egregious circumstances" might take the claim out of the realm of First Amendment protection. *Id*. The court noted, for example, that "a potentially defamatory charge of child molestation might be actionable under the *Sherbert* exception[,]" *id.*, referring to *Sherbert v. Verner*, 374 US 398, 403, 83 S Ct 1790, 10 L Ed 2d 965 (1963) (recognizing the state's ability to restrict religious activity when the activity "pose[s] some substantial threat to public safety, peace or order").

That example only illustrates the difficulties inherent in applying the *Heard* test. In light of the autonomy principle embodied in the Free Exercise Clause, we fail to understand how a defamatory statement accusing a pastor of theft is any more (or less) a matter of church "discipline, faith, internal organization, or ecclesiastical rule, custom, or law[,]" *Serbian*, 426 US at 713, than is a defamatory statement accusing a pastor of child molestation.

As in *Christofferson*, the court in *Heard* struggled to strike a balance between the constitutional protection against civil courts adjudicating disputes involving religious beliefs and practices, while at the same time holding religious groups accountable for tortious behavior based on nonreligious conduct. We conclude that *Christofferson* offers the more tenable approach for achieving the appropriate balance

between those competing interests. *See Wallulis*, 323 Or at 348 ("[T]he question of whether or not a defamatory statement is privileged, either absolutely or conditionally, depends upon the balance that the court strikes between competing interests." (quoting *Lee*, 273 Or at 105)).

■       Applying the principles of *Christofferson* to a defendant's assertion of a free exercise defense to a defamation claim by a pastor against his or her church is relatively straightforward: If the organization is of a religious character, and the alleged defamatory statements relate to the organization's religious beliefs and practices and are of a kind that can only be classified as religious, then the statements are purely religious as a matter of law, and the Free Exercise Clause bars the plaintiff's claim. In defamation law terms, those statements enjoy an absolute privilege.

If, however, the statements—although made by a religious organization—do not concern the religious beliefs and practices of the religious organization, or are made for a nonreligious purpose—that is, if they would not "always and in every context" be considered religious in nature—then the First Amendment does not necessarily prevent adjudication of the defamation claim, but the statements may nonetheless be qualifiedly privileged under established Oregon law.[10]

■       In this case, the alleged defamatory statements— that the pastor had misappropriated money and had demonstrated a willingness to lieand steal—would not "always and in every context" be religious in nature. Thus, even though the statements related to plaintiff's conduct as a pastor of the church, that fact does not render those statements absolutely privileged as a matter of law under the Free Exercise Clause.

---

[10] We note that the Alaska Supreme Court has taken a similar approach. In *Marshall*, the plaintiff, a Presbyterian minister, brought defamation claims against another minister based on allegations that that minister had made false statements to the plaintiff's prospective new church that the plaintiff was dishonest and unable to perform his pastoral duties due to throat surgery, and that he had made an improper advance to a member of his previous congregation. 845 P2d at 425. The court held that, because resolution of the claims did not require a determination of the plaintiff's qualifications to be a minister or what those qualifications might be, the court was not divested of jurisdiction of the claim by the First Amendment; rather, the court concluded, the allegedly defamatory statements were subject to a qualified privilege. *Id.* at 428-29 (citing *Murphy*, 238 Or at 244).

Rather, that fact gives rise to a qualified privilege. As discussed above, a qualified privilege to make a statement arises when the statement is made to protect the interests of the plaintiff's employer or it is on a subject of mutual concern to the defendant and the persons to whom the statement is made. *Benassi*, 62 Or App at 702. As to the first category, the Supreme Court has explained that "employees and their private employers have a legitimate interest in free communications on work-related matters, especially when reporting actual or suspected wrongdoing." *Wallulis*, 323 Or at 350. Moreover, in *Murphy*, the court recognized that communications between church officials on the subject of charges that led to the dismissal of a former missionary of the church—that is, communications "on a subject of common concern to both of them"—were subject to a qualified privilege. 238 Or at 244.[11] The *Restatement (Second) of Torts* § 596, comment e (1977), supports that position:

> "The common interest of members of religious, fraternal, charitable or other non-profit associations, whether incorporated or unincorporated, is recognized as sufficient to support a privilege for communications among themselves concerning the qualifications of the officers and members and their participation in the activities of the society. * * * So too, the rule is applicable to communications between members and officers of the organization concerning the legitimate conduct of the activities for which it was organized."

The burden then falls on the plaintiff to prove that the qualified privilege was abused—that is, that the defendant did not believe the statement to be true or lacked reasonable grounds for believing that it was true, or that the statement was made for a purpose outside the scope of the privilege. *Lewis*, 204 Or App at 104 (citing *Benassi*, 62 Or App at 703); *see also Murphy*, 238 Or at 244 ("Such a communication, if bona fide made, even though it contains criminating matter which otherwise would be actionable, is protected by the privilege, and where a prima facie case of privilege is established, as here, the burden devolves upon the plaintiff to produce evidence of actual or express malice

---

[11] The First Amendment defense was not at issue in that case.

* * *."). In our view, determining whether defendants had reasonable grounds for believing the defamatory statements to be true or whether the statements were made for purposes outside the purpose of the privilege can be resolved without requiring the court to delve into the ecclesiastical concerns of the church.

In sum, we reject defendants' contention that the First Amendment provides an absolute bar to plaintiff's defamation claim in this case. Because that proposition was the sole basis for defendants' JNOV motion, and the trial court granted defendants' motion on that basis, it follows that the court erred.[12]

Reversed and remanded with instructions to reinstate the jury's verdict.

---

[12] Although defendants also sought a directed verdict on the alternate ground that the statements were qualifiedly privileged and plaintiff had failed to present sufficient evidence for a jury to find that the privilege had been abused, they did not renew that argument in their JNOV motion, and they are not defending the JNOV on that basis on appeal. Thus, we need not explore whether there were factual issues for the jury on that defense.